THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER B. TAYLOR, Defendant-Appellant.

Fifth District    No. 5—93—0163

Opinion filed June 30, 1994.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

Defendant appeals from his conviction of the offense of armed robbery (720 ILCS 5/18—2 (West 1992)) after a second jury trial in the circuit court of Madison County. Defendant's first conviction in this case was reversed and the cause was remanded by this court on the basis that defendant had been denied a fair trial because the State failed to disclose to defendant before trial evidence in the State's possession that another person, Thomas Stewart (Stewart), had confessed to the armed robbery of which defendant was convicted. *People v. Taylor* (5th Dist. 1991), No. 5—90—0025 (unpublished order pursuant to Supreme Court Rule 23 (134 Ill. 2d R. 23)).

In this appeal, defendant contends that (1) he was denied a fair trial by the trial court's refusal to admit into evidence the transcript of Stewart's confession to the armed robbery; (2) the cumulative

effect of numerous evidentiary errors and the ineffectiveness of his trial counsel denied defendant a fair trial; and (3) he is entitled to a new trial before a different judge. For reasons we will more fully set forth, we reverse and remand for another trial.

The crime for which defendant has now been convicted twice involves an armed robbery of a Farm Fresh store in Alton, Illinois, on December 14, 1988 (the Farm Fresh robbery). The facts pertinent to this appeal begin immediately after defendant's first trial, which ended in a guilty verdict on June 13, 1989. On July 12, 1989, defendant filed a motion to vacate the judgment of guilty, wherein defendant alleged that he learned after his trial that Stewart had told others that he, not defendant, committed the Farm Fresh robbery. After the motion to vacate was filed, the cause was continued at least five times for various reasons, mainly due to several changes in defendant's court-appointed attorneys.

Finally, on December 4, 1989, defendant's case was called for hearing on defendant's amended post-trial motion and for sentencing. Due to the recent entry into the case of defendant's latest attorney, the hearing on the post-trial motion was continued until January 8, 1990. However, the parties agreed and the court ruled that defendant would be allowed to call Stewart as a witness in support of defendant's post-trial motion during the December 1989 sentencing hearing. The reason for proceeding in this manner was that Stewart was brought to the Madison County courthouse from prison on another offense, and everyone involved wanted to avoid the difficulty of bringing him back to court again in January 1990. At the sentencing hearing, defense counsel called Stewart to the witness stand, stating "I am examining Mr. Stewart in support of the Post-trial Motion to prevent having to bring him back in January." The State did not object.

Stewart testified that he was in the Madison County jail on February 21, 1989, awaiting trial for another robbery (the Domino's Pizza robbery). By the time of this hearing, Stewart had been convicted of the Domino's Pizza robbery and other related charges, and he was sentenced to 60 years' imprisonment for those offenses. Stewart testified that the gun he used in the Domino's Pizza robbery belonged to him and that it was the same gun identified in defendant's trial as the gun used in the Farm Fresh robbery.

Stewart then testified as follows:

"Q. Are you aware of the facts against Chris Taylor, Armed Robbery of the Farm Fresh?

A. Yes, I am.

Q. Do you know who committed that robbery?

A. Yes, I do.

Q. Who did it?
A. I committed the Armed Robbery.
Q. Did you use the same gun that was involved here?
A. Yes, I did."

The State then cross-examined Stewart. Stewart admitted that he remembered Officer Lindell Pyatt (Pyatt) of the Alton police department talking to him about the Farm Fresh robbery while he was in the Madison County jail, but Stewart denied that he had ever told Pyatt that defendant committed the Farm Fresh robbery, and Stewart stated that if Pyatt said that, Pyatt must have lied. Stewart admitted that he told Pyatt, at a time before defendant's trial, that he (Stewart) did not commit the Farm Fresh robbery because "anybody in their right mind" would not do so when facing other charges. Stewart admitted that he was serving a 60-year term of imprisonment at the time of this testimony and that he had known defendant most of his life.

On January 8, 1990, the trial court heard additional evidence and arguments in support of defendant's post-trial motion. During the proceedings, the trial court interjected the following statement:

"THE COURT: Before you call your next witness, Mr. [State's Attorney], just for the record, to keep the record clear, *** Thomas Stewart did testify on December 4, 1989. I believe at the time the parties stipulated that his testimony taken that day would be incorporated in and become part of the proceedings of the Post-Trial Motion.

[DEFENSE COUNSEL]: That's correct.

THE COURT: So the record is clear, that testimony taken on December 4, 1989, is made part of this proceeding today."

After the court heard arguments for and against the post-trial motion, the court denied the motion, finding that the evidence was clear that both eyewitnesses to the crime had no doubt that defendant, and not Stewart, robbed the Farm Fresh store.

The facts as disclosed by the record of defendant's second trial, as they relate to the issues we decide in this appeal, are as follows: A black male entered the Farm Fresh store at about 8:30 p.m. on December 14, 1988. He was not masked and was wearing a long tan trenchcoat and a large black-and-white floppy hat. He pointed a handgun at the clerk, Brenda Hudson (Hudson). She screamed, and the second clerk, Regina Wheeler (Wheeler), looked out of the restroom she had been cleaning. The robber ordered Wheeler to come out of the restroom. The robber then ordered both clerks to give him the money out of the cash register. They put the money and two packages of cigarettes in a bag. The robber then told the clerks to lie down on the floor and left. Hudson called the police.

When Alton police officer Henry Moore arrived at the store minutes later, both Wheeler and Hudson were visibly upset and shaking. Wheeler and Hudson both described the robber as a black male, about 5 feet 11 inches in height, in his early 20's, and weighing between 140 and 155 pounds, a description which would fit either Stewart or defendant.

Earlier that evening, approximately 4 to 12 minutes before the police received the call alerting them to the Farm Fresh robbery, Alton police officer Jonniece Young observed a black male walking across the street toward the Farm Fresh store. He was wearing a long tan trench coat and a large floppy hat. After the robbery, she made a report that listed these facts. At trial, she testified that just before the second trial she amended her report because she realized that the person she saw walking toward the Farm Fresh could not have been defendant. She knew who the defendant was, but she did not know Stewart. The person she saw had skin coloration lighter than hers, more consistent with the coloration of Stewart, and much lighter than defendant's, whose skin is very dark. However, she did not clearly see the person walking toward the store and could not make a positive identification.

A few days after the robbery, Officer Timothy Botterbush (Botterbush), of the Alton police department, showed several photographs to Wheeler. Defendant's picture was not included in the set shown to Wheeler. Wheeler tentatively identified a photograph of Stewart as looking similar to the robber. She also tentatively identified a handgun belonging to Stewart as looking similar to the gun used in the Farm Fresh robbery.

On December 29, 1988, Pyatt showed a different set of photographs to Hudson. The set shown to Hudson included a picture of defendant, but not a picture of Stewart. Pyatt admitted on cross-examination that at the time he showed the photographs to Hudson, he was aware of a statement made by Romel Stevens on December 20, 1988, just six days after the robbery, wherein Stevens implicated Stewart in the Farm Fresh robbery. Pyatt also admitted that at the time he showed photographs to Hudson he was aware that Botterbush had previously shown a different set of photographs to Wheeler, who had tentatively identified Stewart. Hudson tentatively identified defendant as the robber but wanted to view him in person to make sure she was correct.

Pyatt scheduled a physical lineup of suspects, but defendant, who was in jail on unrelated charges, refused to participate. The court then ordered defendant to stand in the lineup, which was conducted on February 21, 1989. Defendant participated in this lineup, but

Stewart did not, even though he was incarcerated in the same facility as defendant at the time of the lineup.

After the lineup, Hudson positively identified defendant as the robber, but Wheeler was shaking and crying and unable to make a positive identification. Both Hudson and Wheeler testified that, during the lineup, defendant had threatened to come back and rob the Farm Fresh "again." Pyatt testified that immediately after the lineup, he quoted defendant in his report as saying that next time he would rob the Farm Fresh "for real." Defendant's counsel objected, and his counsel on appeal spends considerable time arguing that the witnesses should have been restricted to quoting defendant's words verbatim and should not have been allowed to give their interpretation of the meaning of defendant's alleged threat. After a second lineup, Wheeler remembered the voice of the robber and was sure that defendant's voice was the same. Hudson then positively identified defendant as the robber.

Over defendant's objection, Pyatt was allowed to testify that on December 4, 1989, about six months after the first trial, he was at the Madison County courthouse when Stewart and defendant were brought to the courthouse together. Pyatt was allowed to give hearsay testimony that Hudson and Wheeler saw defendant and Stewart at the same time and both stated that defendant was the robber and Stewart was not. Hudson and Wheeler also testified that they had seen defendant and Stewart at the courthouse and that they were still positive that defendant was the robber, not Stewart.

Pyatt was also allowed to testify over defendant's objection that Romel Stevens, who had implicated Stewart in the Farm Fresh robbery, had prior convictions for armed robbery and other offenses. Romel Stevens never testified, and his whereabouts is not shown in the record. Presumably, this attempted "impeachment" of a nonwitness by Pyatt, who was not all that familiar with Stevens' record, was made as rebuttal as to why Pyatt ended his investigation of Stewart. We can only infer that the State wanted the jury to believe that police do not rely on tips from those with criminal records.

Also over defendant's objection, Pyatt was again allowed to testify that, at some unspecified time, he showed Hudson photographs of Stewart. Pyatt testified that Hudson said, after seeing the photographs, that Stewart was absolutely not the robber.

On cross-examination, Pyatt stated that when he originally showed Hudson the photo lineup including defendant, but not Stewart, he was aware that Stewart had a criminal history of shootings and armed robberies. On redirect examination, over defendant's objection, Pyatt testified about Stewart:

"He was known never to do armed robberies unmasked. He also was known to enter a place with a gun drawn, and I believe in his words was, the drops gets the draws. Which means he was control [*sic*]. That was done, it was not done this way at the Farm Fresh Store."

Pyatt never explained who knew that Stewart never did armed robberies unmasked or entered a place without his gun drawn. Further, Pyatt did not lay a foundation for his hearsay testimony as to Stewart's statement and his interpretation of the meaning of such.

Delisa Saez (Saez) testified that she was living with Stewart on December 14, 1988. That evening, defendant came to her house, which was within three blocks of the Farm Fresh store, wearing a long trench coat and "some old ugly hat." Saez testified that defendant told her that he had just robbed the Farm Fresh and that he took a package of Kools, a package of Newports, and over $100. Defendant had a police scanner with him and a black gun in his back pocket. Saez identified defendant in court as the robber.

On cross-examination, when asked what she knew about the gun, she testified that she "didn't know nothing about the gun," but that it could have belonged to defendant or Stewart or "Carlos." She said, "I don't know who it belong [*sic*] to cause they [*sic*] all in it together." She admitted that at the time she originally gave her statement about this incident to the police, she was in jail on an unrelated offense, that she was released the day after giving the statement, and that she was a convicted thief.

After the State rested its case, defense counsel, who was the same attorney who represented defendant at the December 4, 1989, sentencing hearing and the January 8, 1990, post-trial motion hearing, stated that she would have called Stewart as a witness but had learned from Stewart's attorney that Stewart intended to assert his fifth amendment privilege against self-incrimination. U.S. Const., amend. V.

Defendant called two alibi witnesses, his half-brother and his sister, who testified that defendant was with them at their home at the time the Farm Fresh was robbed. However, neither could remember if defendant had been with them the day before or the day after the robbery. Defendant did not testify in his own behalf.

Over defendant's objection, the State recalled Hudson as a rebuttal witness to identify a letter that she received in the mail, dated August 29, 1990. The envelope and letter were introduced into evidence. The return address on the envelope was from "Mr. Taylor N-98254" from Menard, Illinois. Hudson read the letter to the jury:

"Are you people ready to tell the truth. I know Pyat [*sic*] told you

to say it was me. I was witnessing a burglary the night you was rob [*sic*]."

The letter was signed "Taylor."

Before the defendant rested his case, his attorney argued to the court that, although Stewart was unavailable to testify due to the alleged assertion of his fifth amendment privilege, the court should permit her to introduce into evidence a transcript of Stewart's testimony at defendant's prior sentencing hearing. The State argued that Stewart's testimony at the sentencing hearing was unreliable "in view of the whole entire circumstance in which it was made," since he had been sentenced to 60 years' imprisonment at the time he testified, and because the State had not had an adequate opportunity to cross-examine Stewart.

The State argued other reasons why Stewart's testimony was unreliable, which defense counsel pointed out were not in the record. The State requested to make an offer of proof as to these matters, to which defense counsel objected. The trial court responded as follows:

"Well, he can make an offer of proof with Detective Pyatt ***. I think if that testimony is in fact allowed, Detective Pyatt will be allowed to rebut the statement that Tommy Stewart gave to him. ***

Go ahead, I think the question is whether he is unavailable or not."

The case was continued until the following morning, when counsel resumed their arguments. After hearing the additional arguments, the trial court stated numerous times that Stewart had testified at defendant's sentencing hearing, without qualifying that it was offered in support of defendant's post-trial motion. Neither defense counsel nor the prosecutor corrected the judge. The trial judge stated that the issue at the sentencing hearing was not guilt or innocence and that the court had sentenced defendant "finding that Mr. Stewart's testimony at that point in time was not trustworthy, nor was it relevant to the Sentencing Hearing."

The court continued:

"Looking at the circumstances, the fact [is] that this was a Sentencing Hearing, and [the testimony was] not given at Trial, not given before Trial, not presented at the time to, for anyone to determine whether Mr. Taylor was guilty or innocent of this offense, or whether Mr. Stewart was. ***

Because of that, the Court feels that Mr. Stewart's testimony at Sentencing Hearing, under Illinois case law, is not reliable, is not trustworthy."

The trial court did not allow defendant to introduce the transcript of Stewart's testimony. Defense counsel argued that the trial court and

the State had incorrectly remembered or stated certain other facts which are not relevant to this appeal, but neither she nor the prosecutor corrected the judge as to the purpose of Stewart's testimony. The jury returned a verdict of guilty of the offense of armed robbery.

At the hearing on defendant's post-trial motion after the second jury trial, defense counsel elected to stand on the arguments she made and the case law she submitted at trial. Regarding defendant's contention that the trial court erred in not admitting Stewart's transcript, the State argued that his testimony was not reliable, that it was given at the sentencing hearing "without a real opportunity to cross examine [sic] the witness." The trial court again stated that Stewart's testimony "was in fact given at a Sentencing Hearing." The trial judge stated that since Stewart testified at a sentencing hearing, the State had no reason to cross-examine Stewart "because it had nothing to do with the sentence of Mr. Taylor." The trial court concluded that the State really did not cross-examine Stewart and that there was no showing by defendant that Stewart's statement was in any way relevant.

We first consider defendant's argument that he was denied the effective assistance of counsel. Defendant bases this argument on the fact that his trial attorney did not attempt to correct the trial court's mistaken belief that Stewart testified only as part of the sentencing hearing.

When reviewing a charge of ineffective assistance of counsel, there is a strong presumption that counsel's conduct falls within a broad range of reasonable professional assistance. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 297.) The United States Supreme Court has held that a criminal defendant can prove a violation of his constitutional guarantee of the assistance of counsel only if he shows that (1) his counsel's assistance fell below an objective standard of reasonableness and that these shortcomings were so serious that he was deprived of a fair trial, *and* (2) " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255, quoting from *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) In an appeal from a conviction, such as this, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt

respecting guilt." (*Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) Nevertheless, trial counsel must be presumed to have represented defendant effectively, and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

■ We first must consider whether counsel's failure to advise the trial court that Stewart's testimony had actually been given in support of defendant's post-trial motion can be considered sound trial strategy. The State has not posited any such reason, and we cannot discern any ourselves. It appears from the record that, after the first day of trial, all the parties were operating under the same misunderstanding, that Stewart had testified at defendant's sentencing hearing but not in support of the post-trial motion. Obviously, the trial judge placed great emphasis on his belief that Stewart's confession was made at the sentencing hearing, when the only issue was what sentence should be imposed upon defendant.

The trial judge stated on the first day of the second trial that he might allow Pyatt to testify in rebuttal to Stewart's confession. We note that Pyatt testified in the State's case in chief that Stewart denied committing the armed robbery to him. The next day of the second trial and later, at the hearing on the post-trial motion, defense counsel, the State, and the trial judge all seemed to agree that Stewart's testimony was given only as a part of the sentencing hearing. Defense counsel failed again to correct the trial judge's misunderstanding, and the State remained silent. Since the trial judge indicated, when the question first arose, that he was considering admitting the transcript of Stewart's confession into evidence, as well as the rebuttal by Pyatt, we cannot say that defendant's attorney's error was harmless.

If the trial judge had correctly remembered that Stewart testified in support of defendant's first post-trial motion, he might have allowed the transcript to be read to the jury. Of course, we cannot use hindsight to reconstruct what the trial judge might have done if defense counsel had corrected his misunderstanding. The point remains, however, that but for defense counsel's error of not reminding the judge that Stewart's testimony was in fact given in support of his post-trial motion, there is a demonstrated probability that the outcome would have been different, *i.e.*, the probability that the trial judge would have relied on his initial reaction that if the transcript was in fact allowed into evidence, the State should be allowed to rebut it.

Nevertheless, we must still consider whether the transcript was legally admissible, for if not, it does not matter whether the trial judge misunderstood the purpose of the testimony. The argument centers around *People v. Rice* (1993), 247 Ill. App. 3d 415, 617 N.E.2d 360, which unfortunately is on appeal by the State to the Supreme Court of Illinois, docket number 75689 (*People v. Rice* (1993), 152 Ill. 2d 575, 622 N.E.2d 1222 (leave to appeal allowed)). Since we are in agreement with the holding in *Rice*, it would be unfair to the defendant to delay a decision for an indeterminate amount of time, while the supreme court is considering such.

In *Rice*, the appellate court held that under Federal Rule of Evidence 804(b)(3), the trial court erred in not admitting in defendant's trial a transcript of a codefendant's exculpatory testimony given at an earlier motion to suppress evidence hearing. (*Rice*, 247 Ill. App. 3d 415, 617 N.E.2d 360; see also *People v. Bowel* (1986), 111 Ill. 2d 58, 488 N.E.2d 995 (for a discussion of how Federal Rule of Evidence 804(b)(3) became incorporated in State criminal proceedings).) In *Rice*, the court found that in order to satisfy the requirements of Federal Rule of Evidence 804(b)(3), the defendant must show (1) that the declarant is unavailable to testify; (2) that the declarant's statement is against his penal interest; and (3) that corroborating circumstances clearly support the trustworthiness of the declarant's statement. *Rice*, 247 Ill. App. 3d 415, 617 N.E.2d 360.

The court in *Rice* held that the witness was unavailable to testify at defendant's trial because the witness asserted his fifth amendment privilege against self-incrimination. (*Rice*, 247 Ill. App. 3d 415, 617 N.E.2d 360.) We follow the reasoning of the *Rice* case and hold that the unavailability requirement of Rule 804(b)(3) is not so rigid that it should be confined to physical unavailability. (*Rice*, 247 Ill. App. 3d at 417, 617 N.E.2d at 363.) Therefore, Stewart, who invoked his fifth amendment privilege against self-incrimination, was unavailable to testify pursuant to Federal Rule of Evidence 804(b)(3).

As to the second requirement, we find that Stewart's statement was against his penal interest when given. At the time he testified, December 4, 1989, the statute of limitations for prosecuting Stewart for the December 14, 1988, armed robbery of Farm Fresh had not expired. (Ill. Rev. Stat. 1989, ch. 38, par. 3—5(b).) Stewart's testimony exposed him to the possibility of 60 years' additional imprisonment (Ill. Rev. Stat. 1989, ch. 38, pars. 18—2, 1005—8—1(a)(3), 1005—8—4, 1005—8—2(a)(2)), at a time when he had already been sentenced to 60 years' imprisonment. The State argues that the fact that Stewart had been sentenced to 60 years' imprisonment on another offense when he testified to committing the Farm Fresh robbery makes the confession unreliable because he had nothing to lose. We disagree.

We, of course, do not know, nor does the State know, what was in Stewart's mind when he made the judicial confession. However, if Stewart was convicted of the armed robbery in the case at bar, he could have received, in effect, a sentence that would have prevented him from ever leaving the penitentiary alive. We also do not know what hope Stewart may have had of obtaining a reversal of his conviction or a reduction of sentence for the other armed robbery. We do know, according to defense counsel, that Stewart refused to testify again for some reason, so he must have thought that he had something to lose. A conviction in this case certainly would not have benefitted him, if he had a hope for a reversal or leniency. The fact that Stewart had been sentenced to 60 years' imprisonment seems to be more properly used in rebuttal to the statement than as a factor against its admissibility.

*Rice* lists several factors as among those which tend to indicate reliability of the statement and which may serve to satisfy the third requirement of Rule 804(b)(3), that a "statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." (Fed. R. Evid. 804(b)(3); *Rice*, 247 Ill. App. 3d 415, 617 N.E.2d 360.) The factors listed in *Rice* are based upon the facts of that case, which is appropriate, since the trustworthiness of any statement offered under Rule 804(b)(3) is dependent upon the facts peculiar to each case. Fed. R. Evid. 804 (b)(3); *People v. Bowel* (1986), 111 Ill. 2d 58, 488 N.E.2d 995.

There are two main factors which are critical to our resolution of the issue of whether Stewart's testimony was sufficiently trustworthy to be admitted in defendant's trial. First, Stewart initially made incriminating statements to a close personal acquaintance or relative, within days of the crime. This court has already determined that the State wrongfully withheld this information from defendant. Moreover, defendant raised this allegation in his post-trial motion after his first trial. The allegation that the State had withheld exculpatory evidence was the basis for Stewart's testimony in support of the post-trial motion, and it was the basis upon which the first conviction was reversed and remanded for a new trial.

For the State now to argue that Stewart's testimony was too far removed in time from the original crime is to seek benefit from its own wrongdoing. Because of the unique facts of this case, we cannot base our assessment of the trustworthiness of the statement upon the late date in which the testimony was given. The State withheld the opportunity for defendant to obtain the testimony or other evidence

regarding the confession until after defendant had already been convicted. See *Taylor*, No. 5—90—0025 (unpublished Rule 23 order).

The most important factor, however, is that the testimony is corroborated by a large portion of the evidence presented by both sides at trial and is especially relevant to defendant's defenses of alibi and misidentification. The law enforcement authorities originally suspected Stewart of the crime, to the extent that they questioned Stewart and his associate, Romel Stevens, about the crime. Stevens told the authorities that Stewart had confessed to the crime. Stewart, who was in jail on another offense, denied committing the crime, but he apparently knew a lot about the details of how the crime was committed, according to Pyatt's testimony. Pyatt testified that Stewart accused defendant of the crime and gave Pyatt some reasons why he (Stewart) could not be the armed robber. How Stewart became aware of the armed robber not wearing a mask and not pulling a pistol prior to entering the store is not in the record. We can only conclude from the record that Stewart knew a number of details about the armed robbery that he said on one occasion that he did not commit but on two other occasions that he did commit.

The State relies heavily on Stewart's denial of involvement in its argument against the reliability of Stewart's later testimony. However, the law enforcement officials in charge of the investigation did not let Stewart's denial of the crime and accusation of defendant stop them from taking a set of photographs to one of the eyewitnesses, and the set included a photograph of Stewart but not a photograph of defendant. For some unexplained reason, after the tentative identification of Stewart, the authorities stopped investigating whether Stewart might have been involved and concentrated on investigating defendant's involvement, even though Stewart was easily accessible to them and most of the evidence indicated that the gun used in the robbery belonged to Stewart. Additionally, Officer Young testified that the person she saw immediately before the robbery walking toward the Farm Fresh store had skin coloration more consistent with Stewart's than defendant's.

There are simply too many pieces of potentially corroborating evidence to exclude Stewart's confession. The trial court abused its discretion in keeping this information from the jury where there was a substantial amount of evidence that indirectly implicated Stewart in the crime.

The trial judge's, the defense counsel's, and the prosecutor's lapses of memory of the true purpose of Stewart's testimony are crucial, given the evidence presented against defendant and the defenses he raised. The evidence against defendant consisted of eyewit-

ness identification, but no corroborating physical evidence. Defendant presented evidence that he had an alibi for the time of the robbery, and he presented evidence that, if believed, would tend to show that the identifications of him were incorrect. The jury was faced with a decision that turned upon the credibility of eyewitnesses who were confronted with a pistol and an unknown, partially disguised armed robber, as opposed to defendant's alibi witnesses and Alton police officer Jonniece Young. There is a reasonable probability that if the transcript of Stewart's confession to the Farm Fresh robbery had been read to the jury, the outcome of the trial might have been different. The jury may have had a reasonable doubt as to defendant's guilt, and this probability is sufficient to render the outcome of the trial unreliable. Defendant is entitled to a new trial.

Defendant raises a number of other errors allegedly made by the trial court and defense counsel. We are not going to discuss all of those alleged errors, since we are reversing and remanding for a new trial. However, the fact that there were other errors in the trial bolsters our decision to reverse the conviction.

■ First, we believe that Stewart should have been subpoenaed to testify by the defense, so that a record could have been made of his refusal to testify. A statement by Stewart's attorney that Stewart would invoke the fifth amendment does not mean that Stewart would have necessarily followed the advice of counsel or that Stewart's attorney would have advised him to take the fifth amendment, if he appeared in court.

The statute of limitations of three years had expired in that the armed robbery was committed on December 14, 1988, and the second trial was held on October 8, 1994. (Ill. Rev. Stat. 1991, ch. 38, par. 3—5(b).) In *People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316, our supreme court pointed out:

> "The privilege against self-incrimination does not exist where there are no reasonable grounds to fear self-incrimination. [Citation.] Neither an unreasonable fear of self-incrimination nor a mere reluctance to testify is a ground for claiming the privilege. [Citation.] Furthermore, the mere 'say-so' of a witness 'does not of itself establish the hazard of incrimination.' (*Hoffman v. United States* (1951), 341 U.S. 479, 486, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818.) Once a witness asserts his fifth amendment privilege not to incriminate himself, then 'it is for the circuit court to determine if under the particular facts there is a real danger of incrimination.' [Citations.]" (*Redd*, 135 Ill. 2d at 304, 553 N.E.2d at 339.)

Thus, an assertion by Stewart's counsel that his client will take the fifth amendment is not enough. (*Redd*, 135 Ill. 2d 252, 553 N.E.2d

316; U.S. Const., amend. V.) Moreover, Stewart's counsel might have advised his client to testify, if he was reminded of the Illinois Rules of Professional Conduct and if there was no real danger of incrimination of Stewart. 134 Ill. 2d R. 1.1 *et seq.*; *Redd*, 135 Ill. 2d 252, 553 N.E.2d 316; *In re Zisook* (1981), 88 Ill. 2d 321, 430 N.E.2d 1037.

We cannot be certain what Stewart would have done if properly advised by the court that he could not be prosecuted for the crime in the case at bar and that he could be held in contempt of court. The threat of being held in contempt of court, while serving a 60-year sentence, may have only evoked derision from Stewart, but then again, we do not know what Stewart would have thought. It may be that Stewart would hope to gain from coming clean on all of his past offenses. As the old saying goes, "Nothing ventured, nothing gained."

■ The second error that we considered, allowing witnesses to testify as to what defendant meant by a remark, has been held to be reversible error. It is also error for one witness to testify what the witness thinks that another witness meant in making a remark. (*People v. Brown* (1990), 200 Ill. App. 3d 566, 558 N.E.2d 309.) Thus Pyatt, Hudson, and Wheeler should have only related the actual remark defendant made at the lineup and should not have related what they thought the defendant meant by the remark. Further, Pyatt should not have been permitted to interpret Stewart's remark to him about "the drops gets the draws." We might not reverse if these were the only errors, but the errors are cumulative.

■ Pyatt's testimony that defendant said, "The next time that I rob the Farm Fresh I will rob the Farm Fresh for real," was shown to be inconsistent with his recounting of the statement in his police report, which was, "The next time I will rob the Farm Fresh for real." The State was then allowed to improperly present evidence for the rehabilitation of Pyatt, that Pyatt had testified in an earlier proceeding that defendant said, "The next time that he robbed the Farm Fresh, he would do it for real." Prior consistent statements are inadmissible hearsay. *People v. Tidwell* (1980), 88 Ill. App. 3d 808, 410 N.E.2d 1163.

The most intriguing and unique evidentiary question raised is the testimony of Pyatt that in effect told the jury that Stewart could not have committed the armed robbery, because the manner in which the armed robber acted did not fit the *modus operandi* of Stewart. Pyatt reached this conclusion, as best that we can determine, from an almost nonexistent foundation, based on it being known (reputation?) and from Stewart's denial of the commission of the robbery, because it was not done in his style.

In *People v. Tipton* (1990), 207 Ill. App. 3d 688, 566 N.E.2d 352, the court set forth the boilerplate description of *modus operandi*:

"*Modus operandi* means the method of working; it refers to a pattern of criminal behavior which is so distinct that separate crimes or wrongful conduct is recognized as being the work of the same person. [Citations.] It is relevant to prove the identity of the perpetrator, or that he committed the charged offense[,] by allowing the jury to reasonably infer that he committed one offense from the evidence of the other, showing the 'method of work' of the perpetrator. [Citations.] To be admissible, there must be some unique features between the offenses that are not common to that type of offense." (*Tipton*, 207 Ill. App. 3d at 694-95, 566 N.E.2d at 357.)

This case is unique in that the State wished to exclude a person from having committed the armed robbery, rather than prove by inference that the defendant committed the offense, because of the *modus operandi*. Assuming *arguendo* that evidence of *modus operandi* can be used to exculpate another person, the law as set out in *Tipton* should be equally as applicable to the State's attempt to exclude Stewart as the perpetrator as it would be applicable in a case where the State wishes to prove that the defendant was the perpetrator.

■ Immediately, we are led to ask if wearing or not wearing a mask is so distinct or so unique that it would aid in determining whether the same person committed both armed robberies. The same question arises as to having or not having a pistol drawn before entering a store. How can we be so sure, or believe that it is more probable than not, that Stewart would never commit an armed robbery without a mask, if no mask were available and he needed the money? Further, even if the perpetrator did not see Officer Young, can we be so confidant that Stewart would never "case the place" by walking into the building to see who was there, where they were, and what protection they might have before pulling his pistol?

Similarities do not always make the other crime admissible to show *modus operandi*. Evidence of a separate offense is found to be relevant and admissible as proof of *modus operandi* only upon a strong and persuasive showing of similarity and substantial connecting links between the offenses. (*People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470.) By the same token, dissimilarities between armed robberies do not necessarily mean that the same person did not commit both robberies. Here, we do not even have similarities or dissimilarities to compare between two or more armed robberies. We only have a hearsay, self-serving statement from Stewart and a vague reference by Pyatt to Stewart's *modus operandi* reputation. The jury could not reasonably infer from this limited amount of improper hearsay evidence that Stewart could not have committed the armed

robbery in this case. The objection to this testimony should have been sustained.

We must finally consider defendant's argument that this court should on remand order the trial to take place before a different judge. Defendant argues that the trial judge was not a fair and neutral magistrate in that he repeatedly intervened to unfairly harm the defense and committed an egregious accumulation of errors. We disagree. After reviewing the record we cannot find any "unfair treatment" of the defendant that would warrant removal of the trial judge.

For all of the reasons stated, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

WELCH and GOLDENHERSH, JJ., concur.