650 N.E.2d 224 (1994)
272 Ill.App.3d 325
208 Ill.Dec. 767
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Sheila DANIELS, Defendant-Appellant.
No. 1-90-3111.
Appellate Court of Illinois, First District, Second Division.
December 27, 1994.
As Modified on Denial of Rehearing May 16, 1995.
*225 Sam Adam, Chicago, for appellant.
Jack O'Malley, State's Atty. of Cook County, Chicago, for appellee (Renee Goldfarb, William D. Carroll, and Catherine A. Hufford, of counsel).

*226 AS MODIFIED ON DENIAL OF REHEARING
Presiding Justice SCARIANO delivered the opinion of the court:
Defendant Sheila Daniels was convicted by a jury of first-degree murder (Ill.Rev.Stat. 1987, ch. 38, par. 9-1, now codified as 720 ILCS 5/9-1 (West 1992)) and sentenced to 80 years in the custody of the Department of Corrections. On appeal, she contends that (1) her motion to suppress was erroneously denied; (2) evidence regarding polygraph examinations taken by her and her brother prior to her arrest was improperly admitted at trial; (3) evidence relating to the circumstances surrounding her statement to the police was wrongly excluded; and (4) the circuit court erroneously refused to instruct the jury on her alibi defense.
At trial, the State presented the following evidence. On November 12, 1988, at approximately 8:40 p.m., David Ray McCoy, a paraplegic since 1968, was found dead in his car in an alley near the intersection of 87th Street and Cornell Avenue in Chicago, about a block from his office at 8837 South Stony Island Avenue. His body was curled in a fetal position on the floor behind the driver's seat. A .25 caliber semi-automatic handgun, later determined to be the murder weapon, was lying next to his head. After his body was removed, two small caliber cartridge cases were found in the car; blood was found on the front seat armrest as well as on the body. Two days later, McCoy's wallet was found at a McDonald's restaurant located at 1437 East 87th Street, approximately two blocks from the alley where his body was found. The medical examiner recovered two bullets from the back of McCoy's brain, and a third bullet from the right side of his face, but was unable to determine the order of shots or if any single bullet caused his death.
After tracing the gun, police discovered that it had been reported stolen two years earlier by William Hackney. Thereafter, police questioned David Copeland, who had previously been arrested and charged with the theft, about the gun. Copeland admitted stealing it and two other guns when he worked for Hackney in July 1986. He also told the police that about a week and a half after the theft, he sold the handgun to Denton Bailey for $65. The police then questioned Bailey, who told them that after purchasing the gun from Copeland, he sold it to defendant, McCoy's live-in girl friend. Following that sale, Bailey spoke with defendant several times, and "a couple weeks" prior to McCoy's death, he asked her whether she still had the gun. Defendant replied that she did and offered to sell it back, but Bailey declined.
After speaking with Bailey, Chicago police detectives Michael McDermott and John Gallavan, along with Lt. Phillip Cline, went to defendant's house on November 17th to question her about Bailey's statements. They also wanted her to examine some telephone logs because she had told them earlier in their investigation that McCoy had received a phone call between 3 and 4 p.m. on the day he was killed. When they arrived at defendant's house, several other people were there. Defendant was able to recognize some of the telephone numbers on the list, but for each of the others, someone at the station would have to call the phone company to obtain the information. Because this was "very time consuming," the detectives asked defendant to accompany them to the police station in order to simplify the process. Defendant agreed and accompanied them to the police station, arriving there at approximately 5:30 p.m.
At the police station, Lt. Cline told defendant that Bailey had claimed that he sold her the gun that was used to kill McCoy. At first, she denied ever purchasing a gun from Bailey, but then admitted buying a small caliber semi-automatic handgun from him; she stated, however, that she believed her brother Anthony had stolen it from her. Detectives Gallavan and James Boylan then located defendant's brother Anthony, who was brought to the police station, and after being questioned about defendant's allegations, he was released without being charged with any offense.
Defendant was again questioned from 10 to 11:30 p.m. that day and, at approximately 3 a.m., she was placed under arrest, advised of her Miranda rights, and acknowledged that *227 she understood them. She then stated that her brother Tyrone had told her that he had her gun and that he shot McCoy. She agreed to show the detectives where Tyrone lived and directed them to his home. At approximately 3:30 a.m., Tyrone was placed under arrest, and he and defendant were taken to the police station.
At the station, Detective Boylan spoke with defendant while Detective Cummings interviewed Tyrone. After Boylan advised her of her constitutional rights, defendant stated that Tyrone shot McCoy in her house. Boylan then left the room in order to speak with Cummings. When he returned, he confronted defendant with the discrepancies between her account of the events and Tyrone's. At that time, defendant asked to speak to her brother, and after she was allowed to do so, she stated that she would tell the "truth."
She then stated that on November 12, 1988, she and McCoy had an argument. McCoy was sitting in the driver's seat of his car which was parked in the garage. During the argument, she removed the gun from her bathrobe pocket and shot McCoy in the back of the head. Tyrone then removed McCoy's wallet from his pocket, and the two rolled McCoy over the seat into the back of the car, where Tyrone shot him twice in the forehead. Tyrone then wiped off the gun and dropped it on the floor next to McCoy. He then drove McCoy's car to 88th and Cornell, left the keys in the ignition, and locked the car. Tyrone joined defendant in her car, and the two went to the McDonald's restaurant at 87th and Blackstone where Tyrone discarded McCoy's wallet.
After defendant told him what happened, Boylan spoke to Assistant State's Attorney Anna Demacopoulos, who returned to the interview room with Boylan and again advised defendant of her rights. After defendant repeated her account of the events, she agreed to give a statement, and a court reporter was summoned. Defendant's statement was then taken between 8:55 and 9:10 am. After the statement was transcribed, defendant reviewed and signed it, as did Demacopoulos and Boylan, both of whom testified that defendant never requested an attorney nor indicated that she did not want to speak to them about the events in question.
In her statement to the court reporter, defendant stated that on the afternoon of November 12, 1988, she helped McCoy take a bath and get dressed. During this time, they argued for approximately 30 to 40 minutes about the gas meter. Tyrone then rang the doorbell, and defendant "buzzed" him into the house. After McCoy finished getting dressed, he got in his wheelchair, got his gun which he always carried, and asked for some water. When she returned with a gallon jug of water, she heard McCoy cursing into the phone, and then saw him go into the garage. She then got the gun from her purse, put it in the pocket of her robe, and went to the garage. In the garage, McCoy began cursing at her and calling her names while she helped him into the car. She then gave him the water and began to walk away, but McCoy kept screaming at her and picked up his gun. When she walked back towards the car, he threatened to "start kicking [her] ass" and then "jumped" at her. She became scared and pulled out the gun and shot him once. Tyrone then came in the garage, took the gun, brought her into the house, and told her that he would help her get rid of McCoy. She then went to get dressed while Tyrone pushed McCoy over the car seat and shot him with her gun. They then left in separate cars. Tyrone drove McCoy's car and parked it in the alley at 88th and Stony Island. Tyrone then got in her car, took $1500 from McCoy's wallet, and left the wallet at a McDonald's restaurant.
Elaine O'Neal testified for defendant that on November 12, 1988, at approximately 3:30 p.m., she and defendant left defendant's house to go shopping and did not return until nearly three hours later. McCoy was in the house when she first arrived at 3:15, but left before they did.
O'Neal also testified that on November 17, 1988, she went to defendant's house at 6:40 p.m. with defendant's sister Diane because defendant had called Diane and told her that she was going to the police station to look at some phone numbers. When they arrived, there were no adults in the house to take *228 care of defendant's children. They wanted to see defendant at the police station that night, without success.
Gwendolyn "Diane" Daniels testified that defendant told her on November 17th that she was going to the police station to look over some phone numbers. Defendant declined Diane's offer to accompany her to the station. That night, Diane did not succeed in her efforts to see defendant at the station.
Wilbert Taylor testified that he met McCoy in the alley behind his office between 3:30 and 3:45 p.m. on November 12, 1988, in order to repay a loan. At that time, he saw Willie Ross, an acquaintance of his, shoot McCoy while McCoy was in his car struggling with a uniformed police officer.
In rebuttal, Ronald Howland testified that at approximately 4 p.m. on the date in question, he was at McCoy's house returning a television set that he had repaired. At that time, he saw defendant and a black man in the house.
Shirley Bradley testified that she was working for McCoy on November 12, 1988, and that although she spoke to him that day, she did not see him. She also stated that she left the office at approximately 4:15 p.m. that day, and did not hear any gunshots or see McCoy's car parked in the alley.
After the jury found defendant guilty of first-degree murder, the circuit court sentenced her to 80 years' imprisonment. Defendant appealed.[1]

I
Defendant first contends that the circuit court erroneously denied her motion to suppress. She maintains that the court wrongly concluded that she voluntarily accompanied the police to the station on November 17, 1988. She also asserts that regardless of the propriety of the court's determination, any consent which she did give was invalid because it was procured by means of "fraud and ruse." She therefore concludes that any statements which were made while she was at the police station should have been suppressed as the fruit of the prolonged detention and coercion. Finally, she argues that she was illegally arrested because the statement she made that Tyrone had told her that he had the gun and shot McCoy did not provide probable cause for her arrest.
Prior to trial, defendant moved to quash her arrest and suppress statements on grounds that she was illegally arrested in her home without a warrant and that she was denied access to her attorney. At the hearing on the motion, the State presented evidence that the police went to defendant's home on November 17, 1988, in order to ask her about the gun and about numerous phone calls that were made to the house from various lines. They did so because they believed that McCoy knew his killer because defendant had previously told them that shortly before McCoy was killed, he received a phone call at home and seemed very upset. The police did not obtain a warrant to enter the house because defendant was not a suspect at that time.
The police were met at the door by an adult woman who instructed them to wait in the dining room. A few minutes later, defendant appeared and began answering their questions. After spending approximately 20 minutes trying to identify the phone numbers, defendant agreed to go to the police station in order to check the unpublished telephone numbers. Two other adults and two children were in the house, and defendant never indicated any concerns about leaving her children. Defendant was not under arrest and was not handcuffed at any time.
Upon arriving at the police station at approximately 5:15 p.m., defendant was given a large list of phone numbers and asked if she could identify them. She was not searched, fingerprinted, or photographed at that time, and was given free reign of the station and access to the telephones. Later, defendant was brought to an interview room and questioned for approximately one-half hour regarding *229 weapons in the house. The door was always open and defendant was "free to come and go." Based on her statement that her brother Anthony had stolen the gun from her, Anthony was brought to the police station, but was released after a polygraph examination revealed that he had no knowledge of McCoy's murder.
At 11:40 p.m., defendant was advised of her Miranda rights and given a polygraph exam, which lasted approximately two-and-ahalf hours. After learning that she had failed the exam, defendant told the polygraph examiner that her other brother had told her that he had the gun and had shot McCoy. After she was advised of her rights, she repeated her statement to the detectives.
Defendant then directed the police to Tyrone's home and accompanied them as they went to arrest him at approximately 3:30 a.m. At the station, defendant was again advised of her rights, and then questioned for approximately one hour. At 5:30 a.m., Assistant State's Attorney Anna Demacopoulos advised defendant of her rights and interviewed her for approximately 20 minutes. Defendant then agreed to give a statement. At 8:30 a.m., a court reporter arrived and Demacopoulos took her statement, which Detective Boylan signed as a witness.
Defendant testified that following McCoy's killing, police would come to her home every day for approximately 20-30 minutes and speak with her about the investigation. On November 14, 1988, Edward Vrdolyak, an attorney and longtime friend, came to her home and offered to help. Based on that statement, she considered him to be her attorney.
On November 17, 1988, at approximately 4:30 p.m., some police officers arrived at her house and told her to come to the police station to "go over some phone calls." As they arrived, her friend Henrietta was leaving. No other adults were present at that time. The only other people in the house were her 12-year-old daughter and her niece and nephew, aged three and four. The police refused to allow her to wait until her mother came to the house and instructed her not to make any phone calls. However, she was able to call her sister and tell her to come over and watch the children without the knowledge of the police.
Upon arriving at the police station at approximately 5:30 p.m., the officers placed her in a small room, closed the door, and began questioning her for approximately two hours about a .25 caliber gun. She was not allowed to use the phone despite her numerous requests to call both Vrdolyak and her sister. The officers questioned her about Bailey, and told her that unless she admitted they were lovers and that he killed McCoy, she would go to jail because she owned the gun. She then admitted purchasing the gun from him, but stated that it had been stolen. She then told them that her brother Anthony had stolen it from her and then told them where he lived. Two officers then left the interview room. Later that evening, she was taken to another room in the police station where Anthony was being questioned. She noticed that he was bleeding from the corner of his mouth, his face was swollen, and he was crying. He asked her why she told the police he had stolen the gun and shot McCoy. She responded that she did not tell them that, and was escorted back to her interview room.
Around midnight, the officers told her that she would have to take a lie detector test before she could go home. She agreed and was taken to the polygraph examiner, arriving at approximately 1 a.m. The examiner told her that she could go home if she would admit to being lovers with Bobby Champole, one of McCoy's business associates, who had failed the test three times. She refused and was "strapped" into the machine. When the examiner told her that McCoy's spirit was in the room, she became frightened, began crying, and asked to call Vrdolyak.
After approximately two hours of questioning, one of the officers asked her if she had a brother Tyrone. When she responded that she did, but did not know where he lived, the officer brought her back to the police station. After questioning her about Tyrone, the officers told her that she could go home if she agreed to take them to Tyrone's house. After she showed them where Tyrone lived, she *230 was brought back to the police station, and questioned again.
Later, after she was told that Tyrone had said that he shot McCoy, she was taken to see him. He had been beaten and his arms were handcuffed and attached to a hook on the wall. The officers removed the handcuffs and then she asked Tyrone to cooperate and "[s]ign the papers" so that they could go home. Tyrone refused. She was then taken back to the interview room.
Approximately two hours later, at 8 a.m., she agreed to "go along" with the police because she was no longer able to resist and wanted to go home. She then spoke with a woman attorney, not realizing that she was an assistant state's attorney. She gave a statement which was taken by a court reporter, and then signed it without first reading it because she did not have her eye glasses.
Henrietta Leak testified that she answered the door when the officers came to defendant's house on November 17th. The officers were going over some telephone records with defendant as she was leaving. No other adults were in the house at the time.
Demacopoulos testified in rebuttal that defendant never requested a lawyer or stated that she wanted to see Ed Vrdolyak or anyone from her family.
Defendant's motion to suppress was denied. The circuit court expressly found that she was not arrested or seized in her home, but instead voluntarily accompanied the officers to the police station. The court also found that probable cause existed after defendant spoke with the polygraph operator and admitted knowledge of the murder. Finally, the court found "incredible" defendant's testimony that the assistant state's attorney purported to be her attorney, and stated that no credible evidence existed that her will was overborne or that she had invoked her right to counsel.

A
A reviewing court will not disturb the circuit court's ruling on a motion to suppress unless that finding is manifestly erroneous. (People v. Melock (1992), 149 Ill.2d 423, 432, 174 Ill.Dec. 857, 860, 599 N.E.2d 941, 944.) Reversal is thus mandated only if the court's ruling is against the manifest weight of the evidence. (People v. Ferguson (1992), 238 Ill.App.3d 448, 454, 177 Ill.Dec. 883, 887, 603 N.E.2d 1257, 1261.) It is the function of the circuit court to weigh the evidence, determine the credibility of the witnesses, and to resolve any conflict in their testimony. People v. Redd (1990), 135 Ill.2d 252, 268, 142 Ill.Dec. 802, 808, 553 N.E.2d 316, 322.
The officers' testimony in this case supported the State's assertion that defendant voluntarily accompanied the officers to the station. Although defendant's testimony directly contradicted that assertion, the circuit court expressly stated that her testimony was not credible and found that she went to the police station voluntarily. Because there were sufficient bases for that determination, we affirm the circuit court's ruling that defendant was not under arrest and voluntarily accompanied the officers to the police station.

B
Defendant also contends that the police tricked her into accompanying them to the police station when they asked her to come to the station in order to assist in their investigation by reviewing the phone logs. She asserts that the officers knew that they lacked probable cause to arrest her but wanted to question her about the murder weapon in a place "isolate[d] from her family[,] friends[,] and counsel." She therefore concludes that her consent was based upon the "misrepresentations" of the police and consent cannot be characterized as voluntary.
The voluntariness of a consent depends on the totality of circumstances. Consent will be considered voluntary if it was freely given, and was not the result of duress or coercion, either express or implied. (People v. Daugherty (1987), 161 Ill.App.3d 394, 398-99, 112 Ill.Dec. 762, 766, 514 N.E.2d 228, 232.) Use of subterfuge or deception to gain a consent not otherwise available can render a consent invalid. (Daugherty, 161 Ill. App.3d at 400, 112 Ill.Dec. at 766, 514 N.E.2d at 232 (holding that a police officer's false *231 claims that he had official police business to conduct when his real motivation was to search inside for evidence of a crime rendered a consent to enter invalid).) The question of whether consent was voluntarily given is a question of fact to be determined by the circuit court, however, and will not be reversed on appeal unless it was clearly unreasonable. (People v. Krull (1985), 107 Ill.2d 107, 119, 89 Ill.Dec. 860, 866, 481 N.E.2d 703, 709, rev'd on other grounds (1987), 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364.) To be clearly unreasonable, the findings of the trial court must be against the manifest weight of the evidence. See People v. Lewis (1991), 211 Ill.App.3d 276, 280, 155 Ill.Dec. 610, 613, 569 N.E.2d 1221, 1224.
Here, although it is true that the officers had a dual purpose when they went to defendant's home on November 17th, no deception or misrepresentations took place. Defendant was questioned about the phone numbers in her home as well as at the police station. Thus, it cannot be said that her consent was the result of "fraud or ruse."

C
Defendant also contends that her statement to the polygraph operator was not sufficient to create probable cause for her arrest. She maintains that her statement that Tyrone shot McCoy and that she knew he had the gun in his possession was, if anything, self-exculpatory.
Probable cause exists when a reasonable person having the officer's knowledge of the facts and circumstances would believe that the person committed an offense. (People v. Cole (1988), 170 Ill.App.3d 912, 921, 120 Ill.Dec. 744, 749-50, 524 N.E.2d 926, 931-32, appeal denied (1988), 122 Ill.2d 582, 125 Ill.Dec. 225, 530 N.E.2d 253.) The question of whether probable cause exists is controlled by common sense considerations, and the calculation concerns the probability of criminal activity rather than proof beyond a reasonable doubt. People v. Montgomery (1986), 112 Ill.2d 517, 525, 98 Ill.Dec. 353, 355-56, 494 N.E.2d 475, 477-78, cert. denied (1987), 479 U.S. 1101, 107 S.Ct. 1329, 94 L.Ed.2d 181.
Contrary to defendant's assertions, probable cause did exist after she made her statement to the polygraph operator, but it was not based solely upon that statement. Significant other evidence existed which indicated that defendant was involved in McCoy's murder. Most notable was Bailey's statement that he sold her the gun and that she admitted having it shortly before the killing. Also, defendant's own statement to the police that she had purchased the gun from Bailey, after first denying it, further indicated her involvement. Thus, her statement to the polygraph operator merely bolstered the likelihood that she was involved. Accordingly, we find that the circuit court properly denied her motion to suppress.

II
Defendant next contends that the State improperly introduced into evidence at trial the results of polygraph examinations taken by her and her brother Anthony.
During Detective Boylan's direct testimony at trial, he explained that he had questioned defendant until approximately 11:30 p.m. and that she was arrested at approximately 3 a.m. The State meticulously avoided any mention of the polygraph examination.
During cross-examination, defense counsel attempted to show that questioning was continuous during that period, including the time from 11:30 p.m. to 3 a.m. when she was being examined by a polygraph operator. Defense counsel stated repeatedly that the defense theory of the case was that defendant:
"was held in police custody for a period of time. That they wore her down, and subsequently they talked to her, and a statement was engendered, after she was told she would be allowed to go home after she made the statement."
When defense counsel stated during a side bar that he was going to ask a question regarding custody and interrogation, the prosecutor stated that he believed that:
"the door is going to open for us to explain how the police were treating her, what she's doing in police custody, so this jury knows what she was doing, whether she was abused or not, what was going on.
*232 Other people were in the polygraph, which is half the reason this took so long to get to, because they had many people at 11th and State going through polygraphs, which lead up to the final conclusion, we have tried to avoid, but if this is going to become an issue that [defense counsel] is going to raise, it's going to allow us to explain what the police are doing during this period of time."
The court warned defense counsel that if defendant tried to show abuse while in police custody, it might be proper for the prosecutor to bring in the circumstances, but not the results, of the polygraph examination. It would depend on what information the jury would be left with, and the court would have to make a determination after the completion of the cross-examination. The court told defense counsel that he was "treading in dangerous waters", and defense counsel stated that he would avoid the issue of the polygraph exam. The court agreed, but stated that "things can't be viewed in a vacuum." Defense counsel would be allowed to develop his theory that defendant was beaten down and abused during those nearly five hours, but the State would then be allowed to explain why she was there.
During the cross-examination of Boylan, defense counsel asked if he ever got defendant anything to eat; told her she could go out; told her she could see her family; or told her she could leave the police station. Boylan either did not recall or answered all of these questions in the negative. Boylan admitted that where defendant was during this time was a private area, not generally admissible to the public. After reviewing his report pursuant to defense counsel's request, Boylan then stated that the report contained information about the theft of the handgun, but nothing else.
At another side bar at this point in the cross-examination, the State pointed out that the report in question in fact contained information regarding the polygraph. The prosecutor cautioned defense counsel that his line of questioning was close to the edge.
Defense counsel then reinforced the fact that defendant had been in the continuous presence of a police officer from about 5:30 until she was taken to 11th and State at about 11:30 p.m., and that she was in the presence of police officers there "for a period of time." At a third side bar, when defense counsel indicated that he wanted to ask if Boylan again questioned defendant at 11th and State, the prosecutor stated that he would subsequently introduce into evidence the document that defendant signed indicating that she was there voluntarily for the purpose of taking a polygraph examination. Defense counsel stated that he was going to ask the questions anyway, "with the understanding that the results of any polygraph test would not be brought out." The court and the prosecutor agreed, and defense counsel proceeded to question the witness regarding what happened at 11th and State.
During this phase of the cross-examination, defense counsel asked Boylan whether he had gotten defendant anything to eat; let her use the telephone; made arrangements for her to see her family; or arranged for her to use the toilet facilities. Again, Boylan either could not recall or answered in the negative. He admitted, however, that he and his partner were responsible for defendant's safety, care, and custody during this time.
Boylan testified that he began to ask defendant questions regarding the death of the victim at about 3 a.m. He did not prior to that time tell her that she was a suspect. His partner gave her the Miranda warnings. Before that time, Boylan never told her that she was free to leave; that she was under arrest; and that she could leave the police station whenever she wanted. After 3 a.m. she was not free to leave, but she was free to leave when they arrived at about 11:30 p.m. At 3 a.m., defendant had been in the company of the police for approximately eight hours.
Defense counsel then asked Boylan about the trip to arrest Tyrone Daniels. Defendant returned to the police station at about 4 a.m., and defense counsel asked if Boylan had observed defendant sleeping; gotten her anything to eat; let her use the telephone; let her use the toilet facilities; or let her see members of her family. Again, Boylan either could not recall or answered in the *233 negative. He did recall, however, that defendant had told him that she wanted to go home, but by then she was under arrest. Boylan denied telling her that if she made a statement, she would be allowed to go home.
When questioning Boylan about his interrogation of defendant at about 4 a.m., defense counsel asked, "And you continually observed her from approximately 10:00 o'clock the night before until 4:00 o'clock in the morning, is that correct?" Boylan responded, "No, that's not correct," whereupon defense counsel stated, "Well, there's a period of time when you didn't see her, is that correct?" Boylan responded affirmatively.
Also when questioning Boylan about his interrogation of defendant after 4 a.m., defense counsel once again asked about defendant wanting to go home; using the toilet facilities; using the telephone; being given any food; or being allowed to sleep. Once again, Boylan either could not recall or answered in the negative. Defense counsel asked the same questions about what happened at 4:30 a.m., 5 a.m., and 8:30 a.m., with the same answers, except that defendant used the toilet at some point and she slept some time after 5 a.m.
During the cross-examination of Boylan, defense counsel asked a series of questions concerning Anthony Daniels. Following the questioning concerning Boylan's interrogation of defendant at about 5 a.m., the crossexamination proceeded as follows:
"Q. Now, to the best of your recollection, was Anthony Daniels still in the police station?
A. I have no idea.
Q. Well, do you know if Anthony Daniels was released from the police station, before Sheila Daniels was brought back, at some time, at 3:00 a.m.?
A. I didn't see Anthony. I don't know.
Q. Do you know whether Anthony Daniels was brought to the police station in the late hours of November 17th, 1988, or the early morning hours of November 18th?
A. I brought Anthony Daniels to the police station [at] approximately 9:00 o'clock in the evening of the 17th.
Q. Did you subsequently see him leave?
A. No, I did not.
Q. Do you have knowledge as to whether he left?
A. Yes, I do.
Q. Okay. Did you cause for him to be released?
A. Personally, no.
Q. What time do you believe Anthony Daniels left the police station?
[PROSECUTOR]. Objection, Judge.
THE COURT. Sustained.
Q. Do you know whether Anthony Daniels left the police station that night?
[PROSECUTOR]. Objection, asked and answered.
THE COURT. Sustained."
During the State's redirect, Boylan first testified, over defendant's objection as to "form", that Anthony Daniels was given a polygraph exam, but was not charged with any offense arising out of the murder of McCoy. He then testified, over defendant's objection that gave no basis but later was specified as to "form", that at 11:30 p.m., defendant was voluntarily taken to the polygraph unit, spent three and a half hours there, and was arrested following the exam.
Later, during the State's closing argument, the prosecutor stated:
"The police go and pick up Anthony Daniels, and they question Anthony Daniels and take him to 11th and State Street for a polygraph and talk to Anthony Daniels. And what happened? Anthony Daniels is released and he is not charged with anything. So they go back to Sheila."
On appeal, defendant maintains that "[o]nly a jury of dunderheads could have missed the point. Anthony had passed the polygraph; [defendant] had failed it." The State responds that the redirect was a proper attempt to rebut the inferences of coercion from defendant's cross-examination, or in the alternative, that any error was harmless.
Only one short year ago, our supreme court, in People v. Gard (1994), 158 Ill.2d 191, 198 Ill.Dec. 415, 632 N.E.2d 1026, stoutly *234 reaffirmed its oft-repeated condemnation of the use of polygraph evidence in our courts. In Gard, the defendant and his codefendant were charged with arson. The codefendant and John Clutter, a witness to whom she had related the "details" concerning defendant's and her participation in setting a building on fire, testified in behalf of the State. Both the codefendant and Clutter testified several times that they had submitted to polygraph examinations. The defendant raised no objections to this testimony; in fact, he made extensive use of it in cross-examining both witnesses and also in calling Clutter as a witness. On cross-examination, Clutter testified that his answers to questions asked as part of the polygraph examination test were, in general, that he "didn't know anything about it and * * * didn't have anything to do with it." However, after his polygraph examination, he admitted in interviews with authorities that he had been "involved" or "knew something", and further that he told the police everything he knew about the fire and was "truthful" with them. He also testified that he had known during the polygraph examination that he was telling "a lie" but that "after it, I told the truth then." The State also brought out that the defendant had admitted in detail to the police, on the basis of information furnished by Clutter, the commission of the crime. During his summation, the prosecutor pointed out that Clutter lied at first, but that after he "got caught in that lie", he told the truth. Defendant was convicted.
The appellate court ruled that although the admission of evidence concerning the polygraph examination constituted error, the defendant had failed to object to its admission at trial or to raise it in a post-trial motion, and that it was the defendant who had elicited the most damaging evidence of this kind at trial. The court nonetheless elected to invoke the doctrine of plain error and concluded that because the evidence of defendant's guilt was overwhelming, even without Clutter's testimony, the error was not reversible since defendant had not been prejudiced to the extent that he was deprived of a fair trial.
The supreme court reversed the judgments of both the appellate and the circuit courts and remanded the cause for a new trial, ruling "that the admission of evidence of polygraph testing of witnesses at defendant's trial constituted plain error because it was error compromising the integrity and tarnishing the reputation of the judicial process itself." (Gard, 158 Ill.2d at 205, 198 Ill.Dec. at 422, 632 N.E.2d at 1033.) The court explained that
"[t]his court has consistently held evidence pertaining to polygraph examination of a defendant generally inadmissible, declaring unequivocally in People v. Baynes (1981), 88 Ill.2d 225, 58 Ill.Dec. 819, 58 Ill.Dec. 819, 430 N.E.2d 1070, that such evidence is inadmissible in Illinois because it is insufficiently reliable. Moreover, the court observed [in Baynes], `[n]o other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination.' [Citing Baynes.] Because the results of polygraph examinations appear to be quasi scientific, jurors are likely to give such results undue weight. (People v. Taylor (1984), 101 Ill.2d 377, 391-92, 78 Ill.Dec. 359, 462 N.E.2d 478.) As a consequence, the prejudicial effects of polygraph evidence substantially outweigh its probative value. [Citing Baynes.]" Gard, 158 Ill.2d at 201, 198 Ill.Dec. at 420, 632 N.E.2d at 1031.
The court went on to point out that in Baynes it had held polygraph evidence inadmissible in a criminal trial despite the defendant's stipulation prior to the polygraph examination that the results of the test would be admissible, stating "stipulation cannot and does not render unreliable evidence reliable." (Gard, 158 Ill.2d at 202, 198 Ill.Dec. at 420, 632 N.E.2d at 1031.) We should think that both Gard and Baynes furnish a completely sufficient answer to the dissent's concern that defendant in the instant case invited the introduction of polygraph evidence.
In People v. Melock (1992), 149 Ill.2d 423, 174 Ill.Dec. 857, 599 N.E.2d 941, the supreme court recognized a narrow exception to the broad prohibition against use of polygraph evidence where the defendant introduces evidence *235 concerning "the circumstances surrounding a polygraph examination when such evidence is offered on the issue of the reliability of a confession." (Melock, 149 Ill.2d at 459, 174 Ill.Dec. at 876, 599 N.E.2d at 960.) In Melock, the defendant sought to introduce evidence of his polygraph examination to show the circumstances of his confession and to shed doubt on its reliability. The supreme court found that polygraph evidence may be introduced in this situation to ensure the defendant's sixth amendment right to present a defense and to a fair trial. Melock, 149 Ill.2d at 465, 174 Ill.Dec. at 865, 599 N.E.2d at 949.
The Gard court recalled that in Melock it had stressed that "[w]e do not here, today, announce a general rule on the admissibility of polygraph evidence. We, instead, reserve the opportunity to revisit our position on the general admissibility of such evidence as particular issues are presented in future cases." (Melock, 149 Ill.2d at 423, 174 Ill.Dec. at 857, 599 N.E.2d at 941.) The court then announced in Gard: "The case before us presents such an opportunity", which prompted Justice Heiple, in his dissent, to conclude that the majority was creating a per se rule.
The court commented on the inescapable inference that the jury could deduce from Clutter's testimony: his polygraph examination "became the lodestar by which [it] was invited to measure truth"; and his statements before and during the examination were false; however, his statements made after the police advised him that he had failed the polygraph were true. Since his testimony at trial was consistent with his statements following the polygraph, his testimony was true. "By further implication, other witnesses' testimony which was consistent with that of Clutter was necessarily true." (Gard, 158 Ill.2d at 203-04, 198 Ill.Dec. at 421, 632 N.E.2d at 1032.) The court concluded, "[f]or the same reasons that this court has held evidence of polygraph examination of a defendant inadmissible at trial, we hold evidence of polygraph examination of a witness inadmissible at trial." Gard, 158 Ill.2d at 204, 198 Ill.Dec. at 421, 632 N.E.2d at 1032.
We cannot overlook the supreme court's fundamental distrust of polygraph evidence, nor can we minimize in light of Gard the noxious effect such evidence has on the integrity of our judicial system. We therefore follow Gard in invoking the doctrine of plain error to consider the use of polygraph evidence in the case at bar. At defendant's trial, detective Boylan testified that Anthony was not charged with any offense after he took a polygraph examination; he then testified that defendant was arrested after spending three and a half hours at the polygraph unit. The State further highlighted this testimony in closing argument when the prosecutor reiterated that Anthony was released after his polygraph examination, while defendant was arrested. No limiting instruction was provided to the jury. The jury was thus permitted to draw the pernicious inference, plainly and unmistakably before it, that defendant failed the polygraph examination; nothing prevented the jury from considering that failure as evidence of guilt. As the supreme court held in Baynes, and as it reaffirmed in Gard, even if the parties stipulate to the introduction of polygraph evidence, its admission constitutes reversible error. Noting that "[a] stipulation can admit the facts but cannot change the law[,]" the Baynes court, as we have pointed out above, found that "no other form of evidence is as likely to be considered as completely determinative of guilt or innocence as a polygraph examination." Baynes, 88 Ill.2d at 244, 58 Ill.Dec. at 828, 430 N.E.2d at 1079; see also People v. Yarbrough (1982), 93 Ill.2d 421, 67 Ill.Dec. 257, 444 N.E.2d 493.
Like the evidence in Baynes and in Gard, the evidence here is not so closely balanced that the defendant may be said to have been prejudiced by the introduction of the polygraph evidence and thereby prevented from receiving a fair trial. Like the defendant in Baynes and Gard, this defendant herself caused, in part, the admission of polygraph evidence. And, as was done in Gard, an inference was perversely created by both Boylan's testimony and the prosecutor's summation: Anthony was given a lie detector test, after which he was free to go home and not charged with anything; defendant was given a lie detector test, after which she was *236 arrested and indicted for murder. The jury would have to be off on some other spinning planet to miss it. In Gard, the supreme court repeatedly denounced such evidence as "[c]ompromis[ing] the integrity and tarnish[ing] the reputation of the judicial process itself;" as "repugnant;" and "an affront to the integrity of the judicial process." (Gard, 158 Ill.2d at 204-05, 198 Ill.Dec. at 422-23, 632 N.E.2d at 1032-33.) We have not the organs to perceive, therefore, that the dissent's theory as to the "benign" conclusions that can be deduced from the polygraph evidence in this case could have been those adopted by the jury, for none of those inferences was argued by the prosecutor in his summation. Nor does the dissent, or the State for that matter, even hint at why it was proper for Anthony's and defendant's lie tests to be made the subject of a comparative study by the prosecutor. Accordingly, we are not swayed by the dissent's argument that the supreme court cases we cite as authority for our position can be distinguished on the premise that in the instant case there was no explicit or direct evidence regarding the results of defendant's polygraph exam.
Although the record does not so indicate, the State in the trial court in the instant case, and certainly in its brief in this court, was guided by People v. Jackson (1990), 198 Ill.App.3d 831, 145 Ill.Dec. 1, 556 N.E.2d 619, which held that polygraph evidence introduced by the State was admissible for the limited purpose of showing the voluntariness of the defendant's confession. However, in Melock, the supreme court, in commenting on Jackson and People v. Triplett (1967), 37 Ill.2d 234, 226 N.E.2d 30, upon which Jackson relied, stated, "[h]owever, given the ordinarily prejudicial effect of polygraph evidence, the broader holding of Jackson, which would permit the State to offer polygraph evidence to rebut a defendant's assertion that his confession was coerced gives us pause." (Melock, 149 Ill.2d at 463, 174 Ill.Dec. at 874, 599 N.E.2d at 959. (Emphasis added.)) Accordingly, it is extremely doubtful that Jackson is any longer authoritative, if indeed, it has ever been accorded such status.
The State's position at trial was that it would be hard put to explain where defendant was and what she was doing during the period of about 11:30 p.m. to 3 a.m., "without going into [polygraph evidence]." The plain fact, however, is that detective Boylan testified that defendant was voluntarily undergoing interrogation and that she was not being abused in any way. It is difficult to imagine why it would be necessary for the State to suggest or to bring out that defendant, during that time, was being administered a polygraph examination, which after all, entails interrogation. And it could have explained also that one of the reasons her voluntary interrogation took so long was that there were other individuals who were also waiting to be interrogated, a fact that came out in a side bar, without bringing out that they were awaiting a polygraph test. In another side bar, the prosecutor told defense counsel and the judge that he intended to introduce a document signed by defendant in which she agreed to take a polygraph examination. As the State explains in its brief in this court: "It was only after defendant's cross-examination of detective Boylan, that the People elicited testimony regarding defendant's presence at 11th and State, and explained what transpired between 10 p.m. and 3 a.m."
As a matter of fact, however, her taking the test was brought out, as we have indicated above, without introducing the documentproof enough that the voluntariness of her interrogation could have, and, indeed, was brought out without use of the document. Yet, with or without use of the document, Gard and all of the cases cited therein as supporting authority prohibit the use of the testimony that was elicited by both sides in this case.
The State further argues that "[a]ssuming arguendo, that the People's redirect examination improperly elicited the statements concerning the circumstances of defendant's presence at 11th and State, the error was harmless given the overwhelming evidence of guilt."
The State's invocation of harmless error in this case is to be compared with the supreme court's invocation of plain error in Gard, where the evidence of the defendant's guilt *237 was also overwhelming, indeed, damning. In light thereof, we cannot agree that the use of polygraph evidence, to whatever degree and however great her participation therein, to rebut defendant's assertion that her confession was the product of her illegal and protracted detention equates with harmless error. Gard teaches us nothing less. The dissent seeks to further distinguish Gard on the ground that in that case, the "polygraph evidence was very much a part of [the] defendant's trial," and references to polygraph testing were "ubiquitous." "By contrast," the dissent argues, "in this case, the polygraph references were few." It has not come to our attention, however, that such references are required to be tabulated or that incremental error would be a relevant consideration in view of our supreme court's holdings that polygraph evidence is "insufficiently reliable"; that "the prejudicial effects of polygraph evidence substantially outweigh its probative value" (Gard, 158 Ill.2d at 201, 198 Ill.Dec. at 420, 632 N.E.2d at 1031); "that the admission of polygraph testing * * * [is] error compromising the integrity and tarnishing the reputation of the judicial process itself" (Gard, 158 Ill.2d at 205, 198 Ill.Dec. at 422, 632 N.E.2d at 1033); and that even if the parties stipulate to its admission, the "stipulation cannot and does not render unreliable evidence reliable" (Gard, 158 Ill.2d at 202, 198 Ill.Dec. at 420, 632 N.E.2d at 1031). In sum, the invocation of plain error is not dependent upon the ubiquity of the error, but rather upon "defects affecting substantial rights." 134 Ill.2d R. 615(a).
Accordingly, the proper result is to reverse and remand this cause to the circuit court for a new trial, regardless of whether defendant was prejudiced by the introduction of the polygraph evidence, if only to preserve the integrity of the judicial process in this State.

III
Although we are remanding this cause for a new trial, we address the next two issues raised by defendant in the event they arise again on retrial. Defendant contends that the court improperly precluded her from calling her brother Anthony as a "backdrop for her own testimony" in order to show the jury the totality of the circumstances of her confession. At the hearing on the motion to suppress, when defendant tried to have Anthony testify that the police beat him and showed him to defendant, the State objected because nowhere in defendant's motion did she allege that she confessed because of the psychological impact of knowing her family members were being abused. After defense counsel confirmed that no such allegation had been made, the court sustained the objection. When defendant tried to call Anthony at trial, relying on the same proposed testimony, the court stated that its ruling would be the same as at the earlier hearing.
We believe that Anthony's testimony was properly excluded because it was not relevant to defendant's confession. Although it is true that a defendant may present evidence regarding the circumstances surrounding her confession in order to help the jury determine the credibility of that confession and the weight to place upon it (Melock, 149 Ill.2d at 465, 174 Ill.Dec. at 875, 599 N.E.2d at 960), here defendant has failed to allege, much less establish, any connection between Anthony's alleged abuse and her confession. Defendant did not implicate herself until several hours after she saw the allegedly beaten Anthony, and did not give a confession until after she was confronted with the discrepancies between her own and Tyrone's accounts. Moreover, defendant did not testify at trial or offer any other evidence at trial consistent with this theory concerning her confession. Under those circumstances, Anthony's testimony hardly could serve as "backdrop for her own testimony." Accordingly, we reject defendant's assertion that the court wrongly precluded her from calling her brother Anthony.
Defendant also asserts that the circuit court erred when it allowed the State to elicit from Detective Boylan on redirect examination that Tyrone had made a statement implicating her in the murder, because she was unable to cross-examine Tyrone about that statement. Our review of the record reveals, however, that no mention of Tyrone was made until defendant's cross-examination of Detective Boylan, at which time he *238 was extensively questioned about a statement made by Tyrone. On redirect of Detective Boylan, the State was properly allowed to elicit evidence about what he told defendant concerning the inconsistencies between her statements and those of Tyrone. This was properly done to remove any confusion caused by defendant's cross-examination. Only what defendant was told was introduced; the State was not permitted to admit the hearsay testimony of Tyrone.
Defendant further asserts that the court wrongly precluded her from presenting a transcript of the testimony of Tyrone at the hearing on his motion to suppress after he had exercised his fifth amendment privilege against self-incrimination when he was called to testify at her trial. Defendant contends that the transcript of this testimony was relevant to explain why Tyrone made statements to the police. At first, the circuit court rejected the proposed evidence, finding it inadmissible hearsay because Tyrone was not unavailable as a witness merely because he exercised his constitutional right.
This court has held that a witness's unavailability need not be attributable to a physical condition, but can be the result of the witness's utilization of his privilege against self-incrimination. (See People v. Taylor (1994), 264 Ill.App.3d 197, 202 Ill.Dec. 217, 637 N.E.2d 756; People v. Rice (1993), 247 Ill.App.3d 415, 417, 187 Ill.Dec. 152, 617 N.E.2d 360, rev'd on other grounds (1995), 166 Ill.2d 35, 209 Ill.Dec. 635, 651 N.E.2d 1083 accord United States v. Garcia (7th Cir.1993), 986 F.2d 1135, 1139.) Accordingly, we disagree with the circuit court's original analysis that Tyrone was not unavailable as a witness merely because he asserted his fifth amendment right not to testify. Having expressed reservations concerning the "unavailability" of Tyrone, however, the circuit court, after hearing arguments, ruled as follows:
"I do not believe what happened to Tyrone Daniels outside the presence of Sheila Daniels at Area 2 in the early morning hours of November the 18th, 1988, is relevant to the issues that are before this jury. And I will decline the offer on that basis. That is the Court's ruling."
The circuit court therefore denied admissibility of the transcript of Tyrone's testimony on the basis of relevancy. This ruling was correct. Why Tyrone may have made statements implicating himself in the murder, or even implicating defendant, was irrelevant to the question of why defendant made inculpatory statements.[2]

IV
Defendant last contends that the circuit court erred by refusing to instruct the jury on her alibi defense. We note, however, that Illinois law is well established that a jury should not be instructed on a defendant's alibi theory. (See People v. Poe (1971), 48 Ill.2d 506, 511-12, 272 N.E.2d 28, 31-32, cert. denied (1971), 404 U.S. 942, 92 S.Ct. 292, 30 L.Ed.2d 256; People v. Brandon (1990), 197 Ill.App.3d 866, 884, 146 Ill. Dec. 77, 80, 557 N.E.2d 1264, 1267, appeal denied (1990), 133 Ill.2d 561, 149 Ill.Dec. 326, 561 N.E.2d 696; see also IPI-Criminal No. 24.05 (committee comments).) Accordingly, the circuit court did not err in refusing to instruct the jury on the defense of alibi.
In conclusion, because polygraph evidence was erroneously introduced at trial, the judgment of the circuit court of Cook County is reversed and this cause is remanded for a new trial.
Reversed and remanded.
HARTMAN, J., concurs.
DiVITO, J., dissents.
Justice DiVITO, dissenting:
I respectfully dissent from the majority's conclusion that the limited testimony and the statement concerning polygraph examinations in this case constituted reversible error. The majority errs because its premisethat *239 the jury was improperly informed of the results of polygraph examinationsis erroneous.
Proper consideration of the following points requires a judgment contrary to the majority's: (1) the polygraph evidence in this case was necessitated by defense counsel's questions, with his knowledge and concession that those questions and their attendant implications rendered the evidence relevant and admissible; (2) neither the polygraph evidence nor the prosecutor's statement prejudiced defendant and they in no way contributed to her conviction; and (3) the majority's reliance on People v. Gard (1994), 158 Ill.2d 191, 198 Ill.Dec. 415, 632 N.E.2d 1026, is misplaced, because the unique circumstances present in that case were not present here.

Necessity of Polygraph Evidence
In this case, defendant's counsel insisted upon developing defendant's theory of continuous and coercive questioning by police, even in the face of the State's declaration, with the circuit court's approval, that it intended to rebut the inferences of coercion with evidence of defendant's voluntary consent to take a polygraph examination. Defendant's counsel, requesting only that the results of the polygraph not be disclosed, chose to persist in this questioning in order to challenge the voluntariness and thus the credibility of defendant's later confession. This approach was understandable since the reliability of defendant's confession presented a significant obstacle to acquittal. The only support for defendant's attack on the reliability of the confession, however, was defense counsel's reliance upon the questions put to Detective Boylan; except for the implications from those questions, there was no evidence concerning the defense theory of police misconduct.
Until defense counsel's cross-examination of Detective Boylan, the State meticulously avoided any reference to polygraph examinations. (Opinion, at 774 of 208 Ill.Dec. at 231 of 650 N.E.2d.) Even after circumstances concerning polygraph examinations were admitted, the results of the examinations were never admitted. Given the court's admonitions to counsel, counsel's awareness and acceptance of the consequences of his inquiries, and counsel's concession that the evidence of defendant's willingness to take the polygraph was probative of voluntariness (a concession repeated by defense counsel during oral argument before this court), the majority wrongly concludes that the circuit court abused its discretion in admitting circumstances surrounding defendant's agreement to take the polygraph examination.
It would have been wrong to have allowed the jury the unchallenged impression that defendant had endured prolonged and intensive questioning from a single police officer or more, when that was not true. It was therefore proper to allow the State to counter that defense theory when defendant had consented to a polygraph examination, and when hours were spent not in coercive questioning but in transporting her, in awaiting the availability of an examiner, and in administering the examination. In this context, the words of our supreme court are both poignant and applicable: "To hold otherwise would invite repetition of an improper practice and would defeat the truth-seeking function of a trial." People v. Whiters (1992), 146 Ill.2d 437, 443, 167 Ill.Dec. 1042, 1044-45, 588 N.E.2d 1172, 1174-75 (State's evidentiary response to defendant's opening statement, which was unsupported by evidence, was appropriate).
The majority asserts that the polygraph evidence was unnecessary because Detective Boylan had already testified "that defendant was voluntarily undergoing interrogation and that she was not being abused in any way" and because the State "could have explained also that one of the reasons her voluntary interrogation took so long was that there were other individuals who were also waiting to be interrogated." (Opinion, at 779 of 208 Ill.Dec. at 236 of 650 N.E.2d.) The majority's cure for the tactics of defense counsel is to substitute conclusional statements ("voluntarily undergoing interrogation" and "not being abused in any way") and a statement that is not credible ("waiting to be interrogated") with evidence: facts that provide a plausible explanation for the expenditure of time, facts that bolster the State's theory concerning defendant's voluntary cooperation with police, *240 and facts that counter the implication of questions that implied that defendant had not been permitted to eat, had not been allowed to use the telephone, had not been allowed to see her family, and had not been allowed to use toilet facilities. (See opinion, at 775 of 208 Ill.Dec. at 232 of 650 N.E.2d, as well as 774, 775, and 776 of 208 Ill.Dec. at 231, 232 and 233 of 650 N.E.2d.) Regrettably, the majority's decision rewards the defense tactics in this case and invites similar unanswerable behavior in future cases.
As for the evidence of Anthony's taking a polygraph examination, there was justification for the admission of that evidence as well. As the majority opinion itself shows, defense counsel initiated this area of inquiry by asking Detective Boylan about his knowledge concerning Anthony's detention and its length, his release from detention, the time of his release, and Detective Boylan's knowledge of Anthony's leaving the police station and whether Detective Boylan had caused him to be released. (Opinion, at 776 of 208 Ill.Dec. at 233 of 650 N.E.2d.) Moreover, defense counsel's objections to the questions that elicited the polygraph evidence, based as they were on the "form" of the questions, conceded the propriety of this evidence and did not satisfy the requirement of specificity necessary to preserve error.
No Prejudice from Polygraph Evidence
Although there was no explicit evidence about polygraph results, the majority asserts that the evidence about defendant's polygraph, followed immediately by her arrest, improperly communicated to every juror that defendant either confessed during the polygraph examination or had failed it. An analysis of what the jury heard, however, belies those notions.
There was neither direct nor indirect evidence that defendant had confessed during, or even immediately after, the polygraph examination. The evidence was that after taking the examination, defendant implicated Tyrone and helped police apprehend him. It was not until after she was confronted with the discrepancies between her own and Tyrone's accounts, and after she had talked to Tyrone, sometime later and totally unrelated to the polygraph examination, that she confessed her own involvement.
There also was neither direct nor indirect evidence that defendant had failed the polygraph examination. The evidence was that before the examination she said that she suspected Anthony of having taken the gun; afterwards, she said that "Tyrone had told her that he had her gun and that he shot McCoy." (Opinion, at 770 of 208 Ill.Dec. at 227 of 650 N.E.2d.) This change of versions, combined with the other information known to police, is precisely what led to her arrest justifiably so, as the majority properly holds. (Opinion, at 774 of 208 Ill.Dec. at 231 of 650 N.E.2d.) The evidence thus showed that she gave conflicting information about the gun. Both versions could not be true. Just as the majority concludes that the change of stories justified defendant's arrest, the jury could have reached the same conclusion. No one would necessarily conclude that these inconsistent statements derived from the polygraph examination or, more important, that the statement concerning Tyronetrue or falsewas related to any theory of defense, especially when, independent of the polygraph, defendant later conceded that she had been lying.
Furthermore, although there was no evidence that Anthony had passed his polygraph examination, any possible inference that he had done so did not mean that defendant was guilty of murder. Anthony's polygraph had its relevance only in relation to whether he stole the gun, something defendant initially told the police, but a fact unrelated to her theory of defense at trial. Although the jury might have concluded that Anthony had no involvement in the offense a reasonable conclusion since neither the State nor defendant claimed he didthat fact in no way implicated defendant in the murder.
As for the State's argument, there was no explicit statement that Anthony had passed the polygraph examination or that defendant had failed it. Even if the jury inferred that Anthony had passed the polygraph regarding his knowledge of the gun, that fact did not implicate defendant in the murder. Given *241 defense counsel's questioning, which justified the inquiry concerning both Anthony's and defendant's polygraph examinations, the State's argument was factual; it was based upon the evidence.[1]

Gard Distinguished
In applying plain error in this case, the majority correctly points out that in Gard our supreme court found that the admission of the polygraph evidence in that case constituted reversible error, despite overwhelming evidence of the defendant's guilt. In Gard, however, as in People v. Baynes (1981), 88 Ill.2d 225, 58 Ill.Dec. 819, 430 N.E.2d 1070, there was explicit evidence concerning the results of a polygraph examinationsomething not present in this case. What the majority neglects to point out, moreover, is that in Gard, the "polygraph evidence was very much a part of [the] defendant's trial," and references to polygraph testing were "casual and commonplace, virtually ubiquitous." (Gard, 158 Ill.2d at 203, 198 Ill.Dec. at 421, 632 N.E.2d at 1032.) By contrast, in this case, the polygraph references were few, occurring only during the redirect examination of Detective Boylan and the single isolated incident during the State's closing argument. Accordingly, the polygraph evidence was not a significant part of defendant's trial.
More important, however, is the fact that in Gard the polygraph evidence referred to prior statements by a key prosecution witness and indicated that "that which [he] spoke until and during his polygraph examination was false; that which he spoke once advised by the police that he had failed the polygraph examination was true." (Gard, 158 Ill.2d at 203-04, 198 Ill.Dec. at 421, 632 N.E.2d at 1032.) The court therefore concluded that the polygraph evidence became the "lodestar by which the jury was invited to measure truth," because it implied that the witness' trial testimony was true because it was consistent with his statements after being informed that he failed the polygraph examination. (Gard, 158 Ill.2d at 203-04, 198 Ill.Dec. at 421, 632 N.E.2d at 1032.) The court further noted that the polygraph evidence suggested that the other evidence that was consistent with the witness' testimony was "necessarily true." Gard, 158 Ill.2d at 204, 198 Ill.Dec. at 421, 632 N.E.2d at 1032.
In contrast to Gard, the polygraph evidence at issue here was not pervasive and did not serve as a lodestar for measuring truth. Because the facts present in Gard so thoroughly distinguish that case from this one, its holding should not be applied here. The holding of the supreme court in People v. Melock (1992), 149 Ill.2d 423, 174 Ill.Dec. 857, 599 N.E.2d 941, is more akin to the facts presented by this case.
In Melock, our supreme court held that a defendant may introduce evidence concerning the taking of a polygraph examination for the limited purpose of determining the reliability *242 and credibility of a confession. The court recognized the risk of prejudice to the defendant, but stated that "the importance of permitting the jury to weigh the effects of every motivating circumstance surrounding the obtention of [the] defendant's confession outweighs the importance of avoiding the possible prejudice." Melock, 149 Ill.2d at 465, 174 Ill.Dec. at 875, 599 N.E.2d at 960.
To be sure, the issue addressed in Melock was whether the defendant could introduce evidence concerning a polygraph examination. Nevertheless, the Melock principle, that such evidence is admissible to determine the reliability and credibility of a confession, applies also to this case, where defendant's own tactics invited the evidence. Indeed, the defendant's desire to introduce such evidence in Melock is indistinguishable from the actions of defendant which necessitated the evidence in this case.
Our supreme court in People v. Triplett (1967), 37 Ill.2d 234, 226 N.E.2d 30, and the appellate court in People v. Jackson (1990), 198 Ill.App.3d 831, 145 Ill.Dec. 1, 556 N.E.2d 619, gave approval to explicit evidence that a defendant had failed a polygraph examination when such evidence was relevant to the factual question of the voluntariness of that defendant's confession. In Melock, the supreme court said, "we can agree with Jackson and Triplett on the value of limited admissibility of polygraph evidence in special circumstances." (Melock, 149 Ill.2d at 463, 174 Ill.Dec. at 874, 599 N.E.2d at 959.) The court then expressed reservation about the "broader holding" of Jackson, and implicitly Triplett, that the State could introduce such evidence to rebut a defendant's assertion about a coerced confession. The majority refers to this reservation in its opinion (at 779 of 208 Ill.Dec. at 236 of 650 N.E.2d), but neglects to mention that what the court was referring to was the explicit disclosure of the results of polygraph examinations. The supreme court's approval of limited admissibility of polygraph evidence (i.e., the facts and circumstances of such evidence) in special circumstances is clear from its holding in Melock; from its specific statement, as quoted above, in discussing Triplett and Jackson; and from its reliance in Melock on People v. Lettrich (1952), 413 Ill. 172, 108 N.E.2d 488, another case that establishes the principle.
There is no basis for the application of plain error in this case. Justification for plain error cannot be found in either of our State's two sound principles concerning polygraph examinations: (1) results of polygraph examinations are inadmissible under all circumstances (e.g., Gard, Baynes; but the "broad holdings" of Triplett and Jackson might furnish one exception), and (2) evidence and questions concerning the fact and circumstances of polygraph examinations, though generally improper, are proper under some circumstances (e.g., Melock, Triplett, Lettrich, Jackson).
We have been called upon to weigh the propriety of evidence concerning the voluntary taking of a polygraph examination to offset questions containing serious negative implications and having no evidentiary support. The principle provided by Melock adequately covers this case, and should have been applied.
The majority's concern over the integrity and reputation of the judicial process does not dictate the result it reaches here. That concern should have resulted in affirmance.
NOTES
[1] Tyrone Daniels was also indicted for McCoy's murder. Following a separate trial, Tyrone was found guilty of murder, armed robbery, and concealment of homicidal death. We affirmed those convictions on appeal. People v. Daniels (1992), 230 Ill.App.3d 527, 172 Ill.Dec. 20, 595 N.E.2d 83.
[2] People v. Rice (1995), 166 Ill.2d 35, 42, 45, 209 Ill.Dec. 635, 638, 639, 651 N.E.2d 1083, 1086, 1088, provides further support for our conclusion that the circuit court correctly excluded from evidence a transcript of Tyrone's testimony at the suppression hearing. Under similar circumstances, in Rice, the supreme court found that such testimony was inadmissible under the former-testimony or statement-against-interest exceptions to the hearsay rule.
[1] Risking redundancy to ensure clarity, particularly in view of the majority's rejoinder to this dissent (e.g., "We have not the organs to perceive * * *" (opinion, at 779 of 208 Ill.Dec. at 236 of 650 N.E.2d)), I offer the following.

Reduced to its essence, the majority's basis for reversal is summarized as follows: "an inference was perversely created by both Boylan's testimony and the prosecutor's summation: Anthony was given a lie detector test, after which he was free to go home and not charged with anything; defendant was given a lie detector test, after which she was arrested and indicted for murder. The jury would have to be off on some other spinning planet to miss it." (Opinion, at 778 of 208 Ill.Dec. at 235 of 650 N.E.2d.) But what could the jury not miss? The strongest possible argument regarding Anthony's polygraph examination was that, if he passed it, he did not take the gun or, possibly, that he knew nothing of the murderfacts defendant did not and does not dispute. Thus, the strongest inference that can be drawn from Anthony's passing the polygraph examination in no way implicated defendant in the murder.
As for "the pernicious inference, plainly and unmistakably before [the jury] that defendant failed the polygraph examination" (opinion, at 778 of 208 Ill.Dec. at 235 of 650 N.E.2d), the most damaging inference that can be drawn from defendant's taking the polygraph examination was that it may have inspired her to change her statement that Anthony had taken the gun to the statement that Tyrone had done so. Thus, the strongest inference that can be drawn from defendant's failing the polygraph examination related only to her change of stories regarding the gun. Her later statements, unrelated to the polygraph examination, rendered the gun statements disingenuous. There simply was no plain and unmistakable inference that defendant had failed the polygraph examination or that it in any way implicated her in the murder.