THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIM FERGUSON, Defendant-Appellant.

Fourth District   No. 4—92—0003

Opinion filed November 19, 1992.—Rehearing denied December 22, 1992.

John B. Lower and Jeff M. Plesko, both of Guardianship & Advocacy Commission, of Carbondale, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Karen Alice Kloppe, Assistant Attorneys General; of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

This is an appeal by defendant Tim Ferguson from a December 4, 1991, order of the circuit court of Sangamon County, denying a petition for transfer to a nonsecure setting (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(e)), granting a motion in favor of the State for directed verdict, and ordering Ferguson to remain incarcerated in the Chester Mental Health Center (Chester) until further order of the court.

On appeal it is contended that (1) it was error to enter what, in a jury trial, could be a directed verdict and error to deny defendant's petition; (2) the original 1987 trial court order ordering Ferguson "to remain incarcerated in Chester Mental Health Center" was void; (3) the 1987 order violated Ferguson's right to the least-restrictive-treatment alternative; (4) a timely hearing as to Ferguson's July 20, 1989, *pro se* petition was not provided; and (5) the trial court failed to direct notice of the time and place of hearings on the Ferguson petition.

## I. BACKGROUND

Tim Ferguson was born July 1, 1955, and graduated from high school in 1973. In the 1970's, he was diagnosed as schizophrenic. In 1981, evidently while delusional, he stabbed a person several times. In 1985, evidently while delusional, he killed a man with a shotgun—first shooting the victim in the arm, then following the fleeing victim and shooting him in the head. There was no apparent reason for either attack. After the 1985 shooting, he was found not guilty by reason of insanity. A circuit court order of January 1987 provided, in part:

> "The defendant herein, Tim Ferguson, is subject to involuntary admission to the Illinois Department of Mental Health and Developmental Disabilities pursuant to Ill[.] Rev. Stat.[,] Ch. [91½,] §1—100 *et seq*[.], specifically, Ch. [91½,] §1—119(1), as a person who is mentally ill, and who because of his illness is reasonably expected to inflict serious physical harm upon another in the near future.

IT IS THEREFORE ORDERED AND ADJUDGED as follows:

A. The defendant Tim Ferguson is ordered to the Illinois Department of Mental Health and Developmental Disabilities, there to be placed in a secure setting, specifically Chester Mental Health Center, Chester, Illinois, until further order of this court.

\* \* \*

C. The maximum period of commitment to the Illinois Department of Mental Health and Developmental disabilities for this defendant is found to be his natural life time."

Tim Ferguson has been confined at Chester and has been, for the most part, kept free of delusional events by the careful use of intravenous treatment with the drug Prolixin. Increased dosages have been successful in avoiding concerns that arose from time to time.

II. FORENSIC EVALUATION BY MEDICAL DOCTORS CERTIFIED BY THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

On August 20, 1991, Ferguson was examined by a psychiatrist who was not a State of Illinois employee and had previously examined him. The doctor testified before the court on December 4, 1991, and his written report of the August 20, 1991, evaluation was made a part of the record. The significance of the evidence from this witness is illustrated by the following excerpt of the report:

"He is currently taking Prolixin Decanoate 25 mg im every two weeks. This dosage was increased approximately a year ago after he began writing letters of delusional content to Governor Thompson. Since that time his delusional symptomatology has receded. He apparently has not required any acute short term medications for the control of his agitation or psychosis. The petitioner relates that in March of 1989 he wrote a letter to Governor Thompson asking for a pardon after he had been acquitted and he states, 'It got pretty [bizarre]. [ ] It was just a delusional episode.' It was after this his medications were increased.

At the present time Mr. Ferguson is able to reflect back on the two individuals whom he harmed and recognized that these were a function of delusional activity and is able to describe the delusions that he had at the time in some detail. Reflecting back on Mr. Vasconcelles he states, 'I felt if I didn't kill him he would kill me. He never threatened me. [ ]He relates all this to

an experience he had with Vasconcelles in school and states he now realizes this was a delusion.'

MENTAL STATUS EXAMINATION: Mr. Ferguson presented himself as a cooperative, rather friendly white man who is wearing leg cuffs and wrist shackles. The latter were removed so he can drink a cup of coffee during the interview. He recognizes me from previous interviews. He is friendly and rather outgoing. He still has a somewhat blunted affect. His speech is fairly unremarkable although occasionally somewhat disorganized. He does not admit to any hallucinosis or ideas of reference. He has no specific paranoid delusions that I can elicit. He is oriented times three. He is slightly of above average intelligence.

DIAGNOSTIC IMPRESSIONS, CONCLUSIONS, AND RECOMMENDATIONS: Mr. Ferguson best fits the diagnostic category of chronic paranoid schizophrenia in partial remission and clearly improved since his last evaluation. I believe he still has some delusions but he doesn't voice them and I think to some degree he is still ill because of his slightly disorganized thought patterns.

I believe he is receiving a just barely adequate dosage of medicine to suppress his delusions and decreasing his medications in any way would make him delusional and psychotic and allow him to act on these delusions again.

There is no evidence at the present time that Mr. Ferguson is dangerous.

The primary issues are[:] is he getting [an] adequate amount of medication and will he continue to be compliant with this regimen in a nonsecure environment? The risk of tardive dyskinesia is warranted considering the presence of psychosis and history of violence.

If this patient is given approximately twice the present amount of prolixin and is absolutely compliant with this regimen I believe it is safe to transfer him to a nonsecure environment for an indefinite time. He should be reevaluated after one year. If this cannot be done, he should not be transferred."

The doctor testified Ferguson's treatment required a facility with a locked ward, not necessarily a prison facility. He also testified Ferguson was not violent if he was not delusional, but that he must be in a setting where there can be no question he will always receive the required medication. It was necessary that he be placed in a psychiatric hospital setting with a locked unit. He considered the dosage

of Prolixin being given to Ferguson and suggested an increase in the dosage.

### III. FURTHER FACTS

There have been some instances of Ferguson's resisting use of Prolixin. Basically, however, his stay at Chester has been relatively uneventful. Prolixin has been the reason for the lack of delusional episodes. Ferguson appears calm and able to work well with the staff. The problem with Prolixin is the risk of tardive dyskinesia which, in simple terms, is the delayed impairment of the power to execute satisfactorily voluntary movements, especially with the arms or legs.

The evidence before the trial court leads to the inescapable conclusion that escape or release from confinement, without the careful use of Prolixin, would likely result in the return of delusional episodes and dangerous conduct. It also indicates Prolixin has been administered carefully to sustain an acceptable mental and emotional state. A doubling of the use of the drug would possibly increase the danger of tardive dyskinesia.

The administrative assistant at Chester testified that Chester is the Department's maximum security facility, but other mental health centers (including the one in Springfield) have locked wards. Chester is a total maximum security facility, so that patients going to different classes and for different treatments are always in a secure area. This is not true in facilities having only locked wards. Movement of a locked-ward patient in the other facilities is accomplished by non-security personnel escorting the patient.

Ferguson testified as to his stay at Chester and that he had had some minor delusional problems. He has been left on the minimum side of the Chester facility. He seeks the change in placement so that he will be closer to his family for visitation purposes.

### IV. THE LAW

Section 5—2—4 of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4) provides the procedure to follow when there is an acquittal by reason of insanity. The defendant is ordered to the Department of Mental Health and Developmental Disabilities (Department) for an evaluation as to whether he is subject to involuntary admission or in need of mental health services. The Department provides the court with a report and a hearing is held. The result can be an involuntary admission with a need for mental health services on an inpatient basis. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—

2—4(a).) If it is so found, the court shall order the defendant to the Department:

"The defendant shall be placed in a secure setting unless the Court determines that there are compelling reasons why such placement is not necessary. Such defendants placed in a secure setting shall not be permitted outside the facility's housing unit unless escorted or accompanied by personnel of the Department of Mental Health and Developmental Disabilities or with the prior approval of the Court for unsupervised on-grounds privileges as provided herein." Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a).

The initial order of admission shall be for an indefinite period of time, but shall not exceed the maximum possible sentence for the most serious crime for which defendant has been acquitted by reason of insanity. The trial court determines that maximum period of time by appropriate order. Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(b).

A defendant may petition for a transfer to a nonsecure setting within the Department "under the standards of [section 5—2—4(e)] in the court which rendered the verdict." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(e).) The findings of the court shall be established by clear and convincing evidence. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g).) If the defendant brings the petition, the burden of proof and the burden of going forth with the evidence rests on the defendant. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g).) Evidence is presented in open court, with the right of confrontation and cross-examination. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(g).) Section 5—2—4(a) of the Code states, in relevant part:

"(1) Definitions: For the purposes of this Section:

(A) 'Subject to involuntary admission' means: A defendant has been found not guilty by reason of insanity; and

(i) who is mentally ill and who because of his mental illness is reasonably expected to inflict serious physical harm upon himself or another in the near future ***." (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a).)

The element of danger to one's self or another must be established by clear and convincing evidence, and the court's determination thereon is subject to reversal if it is manifestly erroneous. (*People v. Washington* (1988), 167 Ill. App. 3d 73, 78-79, 520 N.E.2d 1160, 1163.) We conclude it necessarily follows that the order of the trial court requiring continued placement in a secure setting will not be reversed unless it is against the manifest weight of the evidence. Our court has also stated the test of a trial court's decision on review is as follows:

"In a proceeding for involuntary commitment under the Act, the State is required to prove the necessary allegations of the petition by evidence, when it is all considered, that is clear and convincing. (*In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273.) However, the reviewing court must give deference to the trial court's decision and cannot set that decision aside because it, applying the above standard, would have ruled differently. *In re Johnston* (1983), 118 Ill. App. 3d 214, 454 N.E.2d 840." *In re Mazzara* (1985), 133 Ill. App. 3d 146, 149, 478 N.E.2d 567, 569.

## V. Analysis

### A. *Alleged Error in Entering Directed Verdict and Denying Petition*

■■ We first reject Ferguson's argument about a "directed" verdict. At the close of his evidence, the State argued the petition should be denied because the choices are secure or nonsecure, with moderately secure not being a choice under the law. The court stated it was not satisfied that Ferguson would be securely kept in a facility other than Chester, and the judge was concerned that treatment with Prolixin might not be effectively administered at a different facility. He then denied the petition. Ferguson was given every opportunity to present his position; confrontation and cross-examination were available. Ferguson failed to meet his burden, and further evidence was not required.

The important issue on appeal relates to whether the trial court properly denied the requested relief. The initial finding of involuntary admission is not questioned, and the statute requires a secure setting. This requirement is controlling, unless a court determines there is a compelling reason why such placement is not necessary. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(a).) Section 5—2—4 of the Code is tailor-made for those acquitted of a crime because of mental illness. The presence of danger is recognized, and protection of the public is a major function of the statutory provision. Protection for the mentally ill is part of the section.

We find "secure setting" to mean exactly that—the patient must be kept in an environment where treatment is available but danger to others is curtailed. A "secure setting" allows more for the patient than the dungeons of the historic "insane asylums." Classes, sports, and hobbies are available to help in the recuperative process. It ap-

pears that Chester, while being a secure setting, offers much more than a locked ward in a nonsecure mental health center.

We cannot fault the ruling of the trial court. The danger resulting from an interruption in Ferguson's medication is clearly evident. An escape by him could lead to tragic consequences, and tight control over his drug treatment is an absolute requirement. We give deference to the trial court's decision and determine it should not be reversed on appeal.

### B. *Claim that the 1987 Trial Court Order is Void*

■■ The original order directed placement at Chester. Section 5—2—4 of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4) does not give the trial court authority to provide for specific placement. "Determination as to which of its institutions is best suited for the confinement of a particular incompetent is left to the Department." (*People v. Lang* (1967), 37 Ill. 2d 75, 80, 224 N.E.2d 838, 841.) However, the statute requires placement in a secure setting. It appears that the Department uses the Chester facility for "secure setting" placements. The court's error was harmless and of no significance.

### C. *Claim That the 1987 Order Violated Right To Least-Restrictive-Treatment Alternative*

■■ Section 2—102(a) of the Mental Health and Developmental Disabilities Code (Disabilities Code) provides for "adequate and humane care and services in the least restrictive environment." (Ill. Rev. Stat. 1991, ch. 91½, par. 2—102(a).) Section 3—811 of the Disabilities Code requires the court to "consider alternative mental health facilities which are appropriate" (Ill. Rev. Stat. 1991, ch. 91½, par. 3—811), when a person is found subject to involuntary admission. Ferguson argues the court denied him these rights. Section 5—2—4(k) of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(k)) provides that section 5—2—4 shall govern when conflicts arise between that section and the Disabilities Code. We find no merit in Ferguson's argument on this issue.

### D. *Claim That Timely Hearing On Pro Se Petition Not Provided*

■ Section 5—2—4(e) of the Code requires the court to set a hearing on a petition such as Ferguson's to be held within 30 days after receipt thereof. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(e).) The hearing was not set within 30 days. This issue was not raised on

the trial level, and the record indicates delays by requests for counsel which were chargeable to Ferguson. We find no error.

### E. *Alleged Error in the Court's Failure To Direct Notice of Hearings*

■ Ferguson objects because the notice of hearing was not directed by the trial court. (See section 5—2—4(f) of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 1005—2—4(f)).) The hearing was held, Ferguson was present, his counsel was present, his witnesses were present. No harm—no reversible error. The guarantees afforded by the trial court satisfied the purposes of section 5—2—4 of the Code. See *In re Splett* (1991), 143 Ill. 2d 225, 230-32, 572 N.E.2d 883, 885-86; *In re Robinson* (1992), 151 Ill. 2d 126.

For reasons stated herein, we affirm the trial court's order denying the petition for transfer to a less secure facility than Chester.

Affirmed.

GREEN, P.J., and McCULLOUGH, J., concur.