THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL A. BARICHELLO, Defendant-Appellant.

First District (5th Division)    No. 1—98—0541

Opinion filed May 7, 1999.—Rehearing denied June 3, 1999.

Mark J. Heyrman, of Edwin F. Mandel Legal Aid Clinic, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Daniel Barichello appeals from a ruling of the circuit court finding him subject to involuntary admission pursuant to section 104—25(g)(2) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/104—25(g)(2) (West 1996)). Defendant contends that: (1) the circuit court erred by applying the wrong standard to the proceedings; (2) confinement under the standard employed violated his rights to due process and equal protection; and (3) the State failed to prove that he is subject to involuntary confinement.

For the reasons that follow, we affirm.

The essential procedural facts of this case were set forth in *Barichello v. Campagna*, 276 Ill. App. 3d 269 (1995). On September 29, 1983, defendant was found unfit to stand trial on charges of murder and the court committed him to the custody of the Department of Mental Health and Developmental Disabilities[1] (the Department) pursuant to section 104—17 of the Code of Criminal Procedure (Ill. Rev. Stat. 1983, ch. 38, par. 104—17 (now 725 ILCS 5/104—17 (West 1996))). After a discharge hearing pursuant to section 104—25 of the Code of Criminal Procedure (Ill. Rev. Stat. 1983, ch. 38, par. 104—25 (now 725 ILCS 5/104—25 (West 1996))), the circuit court determined that the State presented sufficient evidence to show that defendant should not be acquitted. The court remanded him to the custody of the Department for extended treatment under section 104—25(d) of the Code of Criminal Procedure (Ill. Rev. Stat. 1983, ch. 38, par. 104—

---

[1]Now called the Department of Human Services.

25(d) (now 725 ILCS 5/104—25(d) (West 1996))). In June 1989, at the expiration of the extended treatment period, the circuit court committed defendant to the custody of the Elgin Mental Health Center under section 104—25(g)(2) of the Code of Criminal Procedure (Ill. Rev. Stat. 1989, ch. 38, par. 104—25(g)(2) (now 725 ILCS 5/104—25(g)(2) (West 1996))).

In *Barichello v. Campagna*, 276 Ill. App. 3d at 272, this court ruled that the Department erred when it failed to regularly file recommitment proceedings after the June 1989 ruling. This court held, however, that the remedy for this error was not release of the defendant and that the circuit court properly granted the Department leave to file a commitment petition *instanter*.

In June 1997, the circuit court entered an order pursuant to section 104—25(g)(2) of the Code of Criminal Procedure (725 ILCS 104—25(g)(2) (West 1996)), finding defendant presently in need of inpatient services. The circuit court remanded defendant to the Department in a secure setting for a period not to exceed a period ending June 27, 2023. The court set the matter for rehearing in October 1997.

In October 1997, the staff at the Elgin Mental Health Center sent a report to the circuit court indicating that defendant continued to be in need of mental health treatment on an inpatient basis. On December 3, 1997, the circuit court also received a report from Dr. Albert Stipes regarding defendant's condition.

At a hearing on January 13, 1998, the State called Dr. John Raftery, a psychiatrist at the Elgin Mental Health Center, who testified that defendant had been found unfit for trial on a murder charge. Raftery had learned that the murder occurred in 1979 and thereafter, in 1983, defendant confessed to the police. Defendant indicated that on the day of the crime he had gone to church with his family and then went to the home of his friend, the victim. As they talked, defendant saw a knife on the coffee table. He picked up the knife and began to play with it. Defendant then stabbed the man in the chest. The man protested and defendant stabbed him 52 times. Raftery pointed out the sudden and unexpected nature of the crime. Defendant later explained that he thought the man was potentially dangerous or harmful to him.

Raftery further testified that defendant was first considered to have a psychiatric illness in 1979 and was hospitalized at a different facility. Defendant was hospitalized several times until 1983. When defendant came into the State's custody in 1983, he was placed in the Chester Mental Health Center for five years in an attempt to make him fit to stand trial. From 1985 to 1987, defendant was very withdrawn and isolative. He was suspicious of other people and

described paranoid hallucinations and delusions. There were episodes in which he became aggressive and violent so as to require restraints. During that period, defendant made very little progress in his treatment. After that time, defendant made gradual improvements and was transferred to the Elgin facility in 1991.

Raftery stated that in the last few years defendant's condition had improved, particularly since he began taking a drug called Risperidone. Defendant had been given unsupervised on-grounds passes and had generally been free of active psychotic symptoms, hallucinations, and delusions, although it has been noted that he still has some degree of formal thought disorder, which is a residual symptom of his schizophrenic psychotic disorder. It is also noted that defendant tends to be somewhat withdrawn and is reluctant to participate in some activities. There are certain people that he prefers not to be around or certain groups that he prefers not to go to because he has uncomfortable feelings.

Raftery also stated that on December 5, 1997, defendant told him that he thought he may need to switch medications. Defendant was concerned about a relapse and whether he could manage when he was released from the hospital. Defendant told Raftery that, at times, he thought another patient was John Wayne Gacy, although he realized that was probably a "magical thought." Defendant also thought another person was someone else. Defendant felt at times that his roommates were harassing him but he was aware that these were probably symptoms. These symptoms concerned Raftery because they had not been noted for a while.

Raftery testified that Risperidone is a newer antipsychotic medication. Defendant has improved on the medication in terms of active psychotic symptoms, but based on the information Raftery learned in December, he did not believe that the Risperidone had resolved defendant's potential for delusional ideas.

Raftery observed that every time defendant experienced a change he became somewhat anxious and uncertain, to some degree symptomatic. Thus, Raftery recommended small, methodical movements in this case. Raftery added that defendant gradually adjusted and had done well after each change. Raftery did not know of any evidence to indicate that defendant ever tried to hurt himself while at Elgin. To Raftery's knowledge, defendant has not attempted to leave the center and he had no evidence of violence toward any other patient.

Raftery diagnosed defendant with the mental illness of paranoid schizophrenia. He is also considered to have schizo-affective disorder. In addition to the Risperidone, defendant takes Depakote, which is a mood stabilizing medicine. Raftery stated that the most significant

part of defendant's illness is the schizophrenic part. When stressed, defendant's thinking becomes somewhat illogical, his association thoughts become loose or somewhat tangential and circumstantial, and his thinking becomes a little vague. He has the potential to have delusions, which are fixed false beliefs about other people or hallucinations. There was a time when defendant heard voices. Raftery was concerned about defendant thinking another person might be ·John Wayne Gacy because that is someone that one might fear or dislike.

Raftery also stated that defendant had lived continuously in psychiatric facilities for 14 years. He has had his food prepared and his bed provided during that time. His family provides him with some money. Defendant has not had an opportunity to demonstrate an ability to manage these things. Raftery was unclear how easily defendant could provide for his basic needs outside the facility because he has not done so for many years. The center was asking for passes to gradually introduce him to the outside world. Raftery stated he would be anxious about suddenly putting defendant in a relatively independent status because it could exacerbate his illness and lead to psychiatric symptoms. Raftery opined that defendant needs inpatient psychiatric hospitalization, although he hoped that the hospitalization would move toward an outpatient plan.

Raftery recognized that a person would be subject to involuntary admission if there was some reason to think that based on his psychiatric disorder he had considerable potential for immediate harm to himself or others. Before December, Raftery believed that defendant still exhibited some thought disorder and some withdrawals, but he did not show hallucinations or delusions and had not exhibited aggressive or injurious behavior toward himself or others. However, because of defendant's reported concerns in December and the context of the alleged crime, Raftery changed his position and felt defendant "probably still is" subject to involuntary admission. Raftery indicated that under stress defendant could have delusions of a paranoid and potentially dangerous nature with respect to someone else. Raftery also stated that defendant reported mixed feelings about whether he wanted to be ·discharged. The next reasonable step should be supervised off-grounds passes. Raftery thought that defendant is aware that he has a disorder without being totally aware of its level of severity or its potentiality. Raftery admitted that he had equivocated a bit about whether defendant is subject to involuntary admission, but he did not equivocate about his belief that defendant should receive inpatient care.

On cross-examination, Raftery stated that he had no evidence that defendant had made any homicidal threats or had suicidal or self-

injurious thoughts. Defendant participated in activities at Elgin, specifically groups to address coping with mental illness in the community and chemical dependency, and a course to develop some skills for life in the community. Raftery admitted that the treatment team did write in the report that defendant's mental illness had been in remission. However, Raftery stated that is not true. Defendant has consistently shown evidence of thought disorder, a loosening of association, and that stress worsens this condition. Raftery also stated that given the example of December 5, 1997, defendant still has some potential for some degree of delusional thinking.

Raftery did not know if it is possible to have a good understanding of defendant's mental status around the time of the alleged crime, but the information suggests that defendant committed this crime very unexpectedly and Raftery found reason to believe that the crime is related to his psychiatric illness. Given the fact that at least one time recently defendant had a symptom of a delusional and paranoid nature, and given that he still has some degree of thought disorder, Raftery could not state that defendant is unequivocally not a danger to the community. Raftery was concerned that if defendant was released and stopped taking his medication, he would become actively very psychotic and have the potential to commit a crime.

The State also called James O'Brien, a mental health specialist at the Elgin Mental Health Center and a member of the committee that reviews defendant's status. He recommended supervised off-grounds passes for defendant. The court ruled that the request for supervised off-grounds passes be implemented.

The defense called Dr. Albert Stipes, who examined defendant on November 25, 1997. Stipes opined that there was not a reasonable probability that defendant would inflict serious physical harm on himself or another in the near future. He also stated that defendant is able to provide for his basic physical needs so as to guard himself from serious harm, but initially he may need some help with this. Stipes further opined that it is not reasonably expected that defendant would inflict serious physical harm upon himself and it is not reasonably expected that defendant would inflict serious harm upon another unless he had not taken his medication, which would result in a return of his psychotic symptoms and could make him harmful to others.

Stipes' current diagnosis of defendant is schizophrenia, undifferentiated type, which can be managed with medication. If defendant stopped taking his medication, he would become psychotic again. He would be completely out of touch with reality and would be expected to become very paranoid and harmful to others. As long as defendant is on his medication, there is not a reasonable probability that he will

harm others. As long as defendant is supervised, it would be assured that he would take his medication.

Stipes did not believe that defendant is subject to involuntary admission, but he opined that defendant is in need of inpatient care because defendant must take medication on a regular basis. Defendant needs more inpatient guidance and education before he would be ready for a residential placement. Stipes recommended supervised off-grounds passes.

Upon completion of the hearing, the court observed that Dr. Raftery was concerned that defendant may not be doing as well on his current medication as previously thought. The court was concerned by the testimony that every time there is a change in defendant's environment, defendant becomes anxious and symptomatic even though the changes have not been very significant. The court stated that the gist of the doctor's testimony is that the prudent course of action would be to take methodical, small steps in his course of treatment.

The court stated that although there was no evidence that defendant had hurt himself or others in the past 14 years, that is not as probative as it would otherwise be, given the facts alleged in this crime and the impulsive nature of that event. The court also found it undisputed that, when stressed, defendant becomes illogical and more symptomatic. The court was troubled by defendant's reported belief that another patient could be John Wayne Gacy. The court agreed with Raftery that this is a "serious red flag." The court found it clear and convincing evidence that there should be grave concern about the possibility of assaultive thoughts on the part of the defendant, stating:

> "There is clear and convincing evidence based on all the testimony, but most particularly that testimony, that the illness is not in remission. That coupled with the nature of the offense in this case, the unquestioned testimony that the defendant becomes psychotic when exposed to stress, the undisputed testimony that he would become psychotic if he stopped taking his medication, the fact he has never been exposed to anything more challenging than unsupervised on grounds pass[es] leads me to the unquestioned belief that he is if not reasonably expected to inflict serious physical harm upon himself or another, he is certainly unquestionably unable to provide for his basic physical needs [so] as to guard himself from serious harm."

The court gave greater consideration to the testimony of Dr. Raftery, who saw defendant on a daily basis. Further, the court noted that Stipes' opinion did not incorporate the events of December 5. The court found clear and convincing evidence to establish that defendant is subject to involuntary admission.

On appeal, defendant argues that the circuit court applied the wrong standard when it determined that he was subject to involuntary admission. He contends that the court should not have relied on language in section 5—2—4 of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5—2—4 (West 1996)) but should have relied on the standard found in the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1—119 (West 1996)), which includes a preference for outpatient care.

■ The Code of Criminal Procedure provides that when a defendant has been deemed unfit to stand for trial, a discharge hearing must be conducted to determine the sufficiency of the evidence against the defendant. 725 ILCS 5/104—25 (West 1996). If the hearing does not result in an acquittal, the defendant may be remanded for further treatment. 725 ILCS 5/104—25(d) (West 1996). If the State sustains its burden of proof on a charge of first degree murder, the treatment period may be extended up to a maximum treatment period of five years. 725 ILCS 5/104—25(d)(2) (West 1996). If the defendant continues to be unfit at the expiration of the extended treatment period, the court must determine whether he is subject to involuntary admission under the Mental Health Code or constitutes a serious threat to the public safety. 725 ILCS 5/104—25(g)(2) (West 1996). If so found, the defendant must be remanded to the Department for further treatment and must be treated in the same manner as a civilly committed patient for all purposes, except the court is required to approve any conditional release or discharge of the defendant, for the period of commitment equal to the maximum sentence to which the defendant would have been subject had he been convicted in a criminal proceeding. 725 ILCS 5/104—25(g)(2) (West 1996). If the defendant is remanded to the Department, he must be placed in a secure setting unless the court determines that there are compelling reasons why such placement is not necessary. 725 ILCS 5/104—25(g)(2) (West 1996).

■ Section 104—25(g)(2)(i) further provides that 180 days after a defendant is remanded to the Department, and every 180 days thereafter for as long as the defendant is so confined, the facility director shall file a treatment plan with the circuit court. 725 ILCS 5/104—25(g)(2)(i) (West 1996).[2] The court then must conduct a hearing and "make a finding as to whether the defendant is:
(A) subject to involuntary admission; or

---

[2]The legislature added sections 104—25(g)(2)(i) and (ii) (725 ILCS 5/104—25(g)(2)(i), (g)(2)(ii) (West 1996)) in 1996. See Pub. Act 89—439, § 103, eff. June 1, 1996. The parties do not dispute that these provisions apply in the instant case.

(B) in need of mental health services in the form of inpatient care; or

(C) in need of mental health services but not subject to involuntary admission nor inpatient care.

The findings of the court shall be established by clear and convincing evidence and the burden of proof and the burden of going forward with the evidence shall rest with the State's Attorney." 725 ILCS 5/104—25(g)(2)(i) (West 1996).

Defendant recognizes that section 104—25(g)(2)(ii) (725 ILCS 5/104—25(g)(2)(ii) (West 1996)) states that the standards listed shall have the meanings ascribed in clause (d)(3) of section 5—2—4 of the Code of Corrections (730 ILCS 5/5—2—4 (West 1996)). He contends, however, that the definitions from the Code of Corrections should not apply because they only apply to defendants who have been found not guilty by reason of insanity.

■ Section 5—2—4(d)(3) of the Code of Corrections (730 ILCS 5/5—2—4(d)(3) (West 1996)) discusses findings after a hearing regarding release of a defendant found not guilty by reason of insanity. Section 5—2—4(a)(1) defines the terms as follows:

"(A) 'Subject to involuntary admission' means: A defendant has been found not guilty by reason of insanity; and

(i) who is mentally ill and who because of his mental illness is reasonably expected to inflict serious physical harm upon himself or another in the near future; or

(ii) who is mentally ill and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm.

(B) 'In need of mental health services on an inpatient basis' means: a defendant who has been found not guilty by reason of insanity who is not subject to involuntary admission but who is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care or is in need of inpatient care." 730 ILCS 5/5—2—4 (West 1996).

While these definitions are contained in the sections pertaining to defendants found not guilty by reason of insanity, they have been adopted by the legislature to apply under section 104—25(g)(2)(i) of the Code of Criminal Procedure. Therefore, the circuit court properly followed these definitions.

■ Further, we note that section 104—25(g)(2) states that if a defendant is remanded to the Department, he shall be placed in a secure setting unless the court determines that is unnecessary. Section 104—29 of the Code of Criminal Procedure (725 ILCS 5/104—29 (West 1996)) directs that if there is a conflict between that code and the Mental Health Code, the Code of Criminal Procedure governs. In

*Maust v. Headley,* 959 F.2d 644 (7th Cir. 1992), the court found that section 104—17(b) of the Code of Criminal Procedure (Ill. Rev. Stat. 1989, ch. 38, par. 104—17(b) (now 725 ILCS 5/104—17(b) (West 1996))), which required that a defendant found unfit for trial and placed in the custody of the Department be placed in a secure setting, conflicted with provisions of the Mental Health Code providing for confinement in the least restrictive environment (Ill. Rev. Stat. 1981, ch. 91½, par. 2—102(a) (now 405 ILCS 5/2—102(a) (West 1996))). The court held that the section of the Code of Criminal Procedure had the effect of eliminating any interest a defendant found unfit for trial had under the Mental Health Code to confinement in the least restrictive environment. *Maust,* 959 F.2d at 648. Although the case at hand involves different sections of the two codes, we likewise hold that the provisions of the Code of Criminal Procedure govern here. See also *C.J. v. Department of Mental Health & Developmental Disabilities,* 296 Ill. App. 3d 17, 24 (1998) (provisions of the Code of Corrections governed over individuals found not guilty by reason of insanity where there is a conflict between the Code of Corrections and the Mental Health Code).

As acknowledged by defendant, the standards under section 104—25(g)(2)(i) of the Code of Criminal Procedure are similar to those found in the Mental Health Code,[3] with the Mental Health Code adding a preference for outpatient care. Nevertheless, defendant argues that applying the definitions from the standards of the Code of Corrections violates his rights to due process and equal protection. In *Jackson v. Indiana,* 406 U.S. 715, 720, 32 L. Ed. 2d 435, 440, 92 S. Ct. 1845, 1849 (1972), the Supreme Court ruled that Indiana could not commit a defendant for an indefinite period simply because he was incompetent to stand trial. Because Indiana's statute subjected Jackson to a more lenient commitment standard and a more stringent standard for release than those applicable to others not charged with offenses, Indiana deprived Jackson of equal protection by in effect condemning him to permanent institutionalization without the showing required for commitment or the opportunity for release afforded to others. *Jackson,* 406 U.S. at 730, 32 L. Ed. 2d at 446, 92 S. Ct. at 1854. The Court also determined that Indiana violated Jackson's due process rights, stating

---

[3]We note that case law based on prior versions of section 104—25(g)(2) indicated that the standards for commitment pursuant to this section were the same as that for the Mental Health Code. See *People v. Polachek,* 128 Ill. App. 3d 200, 205 (1984); *People v. Lavold,* 262 Ill. App. 3d 984, 992 (1994); but see *Lavold,* 262 Ill. App. 3d at 1002 (McNulty, J., specially concurring in part) (noting differences between the statutes).

that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson*, 406 U.S. at 738, 32 L. Ed. 2d at 451, 92 S. Ct. at 1858.

This court has already distinguished *Jackson* from Illinois cases involving defendants subject to commitment upon completion of a discharge hearing in which the State demonstrated evidence of the defendants' guilt. See *People v. Raseaitis*, 126 Ill. App. 3d 600, 607 (1984); *Yiadom v. Kiley*, 204 Ill. App. 3d 418, 425-27 (1990); *Barichello v. Campagna*, 276 Ill. App. 3d at 273.

■ The test of whether a statute violates equal protection is whether the classification is rationally related to a legitimate governmental objective, with the burden on those challenging the law to prove that it is arbitrary and invalid. *Raseaitis*, 126 Ill. App. 3d at 605-06, citing *Garcia v. Tully*, 72 Ill. 2d 1 (1978). Defendant has not shown that the statutory scheme treating an individual committed under section 104—25(g)(2)(i) of the Code of Criminal Procedure different from an individual committed under the Mental Health Code is constitutionally invalid. The difference in treatment is rationally related to the government's legitimate objective of protecting the public and handling commitment of defendants unfit for trial. See *People v. Pastewski*, 164 Ill. 2d 189, 200 (1995) (differences between statutory schemes for defendants found unfit for trial but acquitted in a discharge hearing and defendants found unfit for trial but not acquitted in a discharge hearing were reasonably related to the different purposes each served); see also *Raseaitis*, 126 Ill. App. 3d at 605-06 (statute providing for continued confinement of defendants found unfit to stand trial not arbitrary or unreasonable so as to violate equal protection despite the fact that such a defendant may be subject to longer periods of confinement than defendants found unfit after the effective date of the statute).

When weighing due process claims, courts consider the private interest at stake, the government interest involved, and the risk that the private interest will suffer an erroneous deprivation. *Barichello v. Campagna*, 276 Ill. App. 3d at 273, citing *Mathews v. Eldrige*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976). In *Barichello v. Campagna*, 276 Ill. App. 3d at 273, this court recognized that the private interest at stake in commitment cases is substantial, that is the defendant's liberty (*Foucha v. Louisiana*, 504 U.S. 71, 78-79, 118 L. Ed. 2d 437, 447, 112 S. Ct. 1780, 1784-85 (1992)), but the government has an interest in detaining persons who have committed criminal acts and are in need of clinical treatment. This court found the chances of erroneous deprivation of rights slim where the Department

had at least performed continuing evaluations of defendant's condition and therefore there was no due process violation even though the Department failed to initiate recommitment proceedings. *Barichello v. Campagna*, 276 Ill. App. 3d at 273. See also *Pastewski*, 164 Ill. 2d at 200 (no due process violation because differences between statutory scheme for defendants acquitted by reason of insanity and scheme for defendants found unfit to stand trial but not acquitted after a discharge hearing were reasonably related to purposes they served); *Raseaitis*, 126 Ill. App. 3d at 607-08 (statute subjecting defendant to extended treatment periods after a discharge hearing at which the State met its burden of proof provided a reasonable means of balancing the interests of defendants found unfit for trial and society).

■ There is no due process violation here. The government's interest in detaining persons who have committed criminal acts and are in need of clinical treatment is strong and, in light of the statutory protection in place, the possibility of erroneous deprivation of defendant's liberty is slim. The nature and duration of defendant's confinement bear a reasonable relation to the purpose for which he has been committed. *Cf. C.J.*, 296 Ill. App. 3d at 33 (issue of fact precluded ruling on whether the nature of confinement for individuals found not guilty by reason of insanity bore a reasonable relation to the purposes for which they were committed where the Department allegedly imposed a policy preventing the consideration of requests for unsupervised on-grounds passes). Furthermore, as noted, defendant has no statutory interest in being placed in the least restrictive environment. See *Maust*, 959 F.2d at 648; *Barichello v. McDonald*, 98 F.3d 948 (7th Cir. 1996) (individuals found unfit for trial have no statutory right to treatment in the least restrictive environment); see also *C.J.*, 296 Ill. App. 3d at 27 (no due process violation where no state-created liberty interest in treatment in the least restrictive environment or in pass privileges). Thus, there cannot be an improper deprivation of such a statutory liberty interest.

■ Defendant also argues that even if this court applies the definitions from the Code of Corrections, the State failed to demonstrate that he can be involuntarily confined. At the conclusion of the hearing, the circuit court indicated that even if defendant is not reasonably expected to inflict serious physical harm upon himself or another, "he is certainly unquestionably unable to provide for his basic physical needs [so] as to guard himself from serious harm." A circuit court's finding that a person is subject to involuntary commitment will not be reversed unless manifestly erroneous. See *People v. Hager*, 253 Ill. App. 3d 37, 42 (1993); *People v. Ferguson*, 238 Ill. App. 3d 448, 454 (1992).

In *People v. Grant*, 295 Ill. App. 3d 750, 751 (1998), the Department recommended that Grant be conditionally released pursuant to section 5—2—4(d)(2) of the Code of Corrections (730 ILCS 5/5—2—4(d)(2) (West 1996)). While *Grant* involved a defendant found not guilty by reason of insanity, it is instructive because it relies on the same definitions for involuntary admission. One of Grant's doctors testified that Grant was stable, not suffering from antipsychotic symptoms, and suitable for conditional release despite a diagnosis of paranoid schizophrenia. *Grant*, 295 Ill. App. 3d at 752. The doctor acknowledged that Grant might have continuing problems with ineffective coping skills, wherein he might not deal well with stress and other problems. *Grant*, 295 Ill. App. 3d at 753. A second doctor agreed that Grant should be conditionally released and that Grant was not a danger to himself or others. Grant suffered a "distortion in thought process marked primarily by delusions of paranoia with the fantasy that the government was seeking to harm him or arrest him." *Grant*, 295 Ill. App. 3d at 753. Grant's paranoid schizophrenia was in remission. The circuit court denied the recommendation for conditional release because it found Grant still had problems, still had ineffective coping skills, had possible problems with stress, and the court "wanted assurances that defendant would not act violently if faced with a stressful situation." *Grant*, 295 Ill. App. 3d at 755.

This court determined that the circuit court applied the wrong standard of proof and reversed because the State failed to show by clear and convincing evidence that Grant was subject to involuntary admission or in need of mental health services on an inpatient basis. *Grant*, 295 Ill. App. 3d at 757-58; see also *People v. Nelson*, 244 Ill. App. 3d 356 (1993) (reversing denial of Department's recommendation that defendant found not guilty by reason of insanity be conditionally released). The *Grant* court also found that the circuit court erred in requesting assurances that Grant would not harm himself or others after being confronted with stressful situations. *Grant*, 295 Ill. App. 3d at 760, citing *People v. Smith*, 126 Ill. App. 3d 5, 9 (1984). This court did not find the possibility of having difficulty adjusting to the stresses of noninstitutional life sufficient to sustain a denial of conditional discharge. *Grant*, 195 Ill. App. 3d at 761. Further, Grant took medication that was successful in keeping his mental illness in remission. *Grant*, 295 Ill. App. 3d at 761.

■ In the instant case, the circuit court properly required the State to prove its case by clear and convincing evidence. Based on the evidence presented, the circuit court's findings were not manifestly erroneous. Unlike the cases cited by defendant, the expert testimony offered here did not recommend defendant's release from inpatient care.

While hesitant, Raftery essentially testified that he still found defendant subject to involuntary admission, and both doctors testified as to defendant's need for continued inpatient care. Further, the evidence did not establish that defendant's illness was in remission. While Raftery testified that he had thought the illness was in remission, he changed his position based on the information he learned in December 1997.

The evidence clearly established the defendant suffered from the mental illness of paranoid schizophrenia. Although defendant had been doing well on his medication, this did not completely resolve his illness. In December of 1997, defendant informed Raftery that he thought another patient was John Wayne Gacy. Raftery and the court were seriously concerned about this information, particularly because Gacy would be someone that one might fear or dislike. Raftery recited the serious and unexpected nature of the crime to which defendant confessed and the fact that defendant thought the victim was potentially dangerous or harmful to him.

Raftery also testified that defendant had trouble adjusting to changes and recommended small steps in the course of treatment. Defendant becomes stressed by change and stress worsens his condition. Raftery recommended supervised off-site passes as the next step. The evidence further established that defendant had not been out of a controlled setting for 14 years. While he had taken some classes to learn to provide for himself, he had not been responsible for providing his meals or a place to sleep for many years.

The information regarding defendant's condition and the facts concerning the unpredictable and severe nature of the crime support the circuit court's conclusion that defendant is subject to involuntary admission. Defendant is mentally ill and because of his illness he is still reasonably expected to inflict serious physical harm upon himself or another in the near future and his is unable to provide for his basic needs so as to guard himself from serious harm.

Defendant contends that the circuit court improperly considered the fact that he might not take his medication if released. In *People v. Nunn*, 108 Ill. App. 3d 169, 171 (1982), this court ruled that the possibility that a defendant might fail to take prescribed medication and thus be a danger to himself or others does not satisfy the State's requirement to prove a defendant is in need of hospitalization under the Mental Health Code. Likewise, in *Hager*, 253 Ill. App. 3d at 42, this court stated that the possibility that the defendant may not comply with his prescribed treatment is not sufficient to sustain a finding of involuntary commitment.

In the instant case, the testimony went beyond concerns that de-

28

fendant might fail to take his medication upon release. The evidence indicated that even on his current medication defendant experienced some symptoms that raise a serious flag for concern. The experts did not recommend his release at this time, but suggested off-site supervised passes as the next appropriate step and the circuit court granted that request.

For the reasons stated, we affirm the circuit court.

Affirmed.

HARTMAN and THEIS, JJ., concur.